IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:14-cv-21803

CHEYLLA SILVA and JOHN PAUL
JEBIAN,

Plaintiffs,

v.

BAPTIST HEALTH SOUTH FLORIDA,
BAPTIST HOSPITAL OF MIAMI, INC. and
SOUTH MIAMI HOSPITAL, INC.

Defendants.
_____/

## AMENDED COMPLAINT[1]

COMES NOW, Plaintiffs, CHEYLLA SILVA and JOHN PAUL JEBIAN, by and through their undersigned counsel, sue the Defendants, BAPTIST HEALTH SOUTH FLORIDA, BAPTIST HOSPITAL OF MIAMI, INC. and SOUTH MIAMI HOSPITAL, INC. for their causes of action, and state the following:

### JURISDICTION AND VENUE

1. This Court has original jurisdiction over the action pursuant to 28 U.S.C. § 1331, 1343, and 1367 for the Plaintiffs' claims arising under Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12181 and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. In this action, Plaintiffs suffered injuries and now seeks damages.

---

[1] The original Complaint, filed on May 16, 2014 named the incorrect party. [D.E. 1].

2. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because (a) the Defendants are in this judicial district, and (b) a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within this judicial district.

## PARTIES

3. CHEYLLA SILVA is a resident of Florida who is deaf and communicates in American Sign Language (ASL) and is therefore a qualified individual with a disability under the Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA) and is otherwise *sui juris*.

4. JOHN PAUL JEBIAN is a resident of Florida who is deaf and communicates in ASL and is therefore a qualified individual with a disability under the RA and ADA and is otherwise *sui juris*.

5. CHEYLLA SILVA and JOHN PAUL JEBIAN are collectively referred to as "DEAF PLAINTIFFS".

6. Defendant, BAPTIST HEALTH SOUTH FLORIDA owns and operates Defendant, BAPTIST HOSPITAL, INC., located at 8900 N. Kendall Drive, Miami, FL 33176 and SOUTH MIAMI HOSPITAL, INC., located at 6200 Southwest 73rd St. Miami, FL 33143 (hereinafter collectively referred to as "BAPTIST").

7. BAPTIST also owns and operates Baptist Medical Plaza at Westchester, located at 8840 Bird Road, Suite 100 Miami, FL 33165.

8. BAPTIST is a recipient of federal financial assistance, and is therefore subject to the requirements of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## FACTS

**Background Facts – Cheylla Silva**

9. At the onset of the material times, CHEYLLA SILVA was a 27-year-old woman who is deaf and communicates in ASL.

10. In addition to being deaf, CHEYLLA SILVA also has high blood pressure.

11. On approximately twenty different occasions between 2009 and the present, BAPTIST failed to provide a qualified sign language interpreter for SILVA during most hospitalizations.

12. At each such appointment, BAPTIST staff conducted tests, performed procedures and obtained SILVA's signature on numerous forms, without effectively communicating with her.

13. At each such appointment, SILVA would inform BAPTIST from the time of admission to the time of treatment that she was deaf and required an interpreter. The fact that she was deaf was clearly noted by the nurses and in the medical record.

14. Despite the availability of many American Sign Language interpreters in Miami, BAPTIST refused and continues to refuse to retain American Sign Language interpreters for its Deaf patients.

    a. BAPTIST used SILVA's mother without her and SILVA's mother's consent. SILVA's mother speaks Spanish as her first language, has no medical training, does not know medical terminology and is not an interpreter.

    b. BAPTIST used SILVA's brother without her and SILVA's brother's consent. SILVA's brother speaks Spanish as her first language, has no medical training, does not know medical terminology and is not an interpreter.

    c. BAPTIST used SILVA's fiancée without his and SILVA's consent. Further, SILVA's fiancé is himself, hard of hearing, and does not know medical terminology and is not an interpreter.

    d. BAPTIST attempted to communicate by writing in short messages which did not allow appropriate expressive or receptive communication, such as asking and responding to questions, and was not effective

    e. On one occasion, BAPTIST has obtained an educational interpreter who was not qualified as she could not interpret any complicated terminology, and did not interpret any medical terminology.

    f. BAPTIST attempts to use Video Relay Interpreters, however, its staff is not trained on how to use this equipment, or the video connection is inadequate to obtain a clear signal to effectively communicate.

    g. BAPTIST attempts to use Video Relay Interpreters in situations where effective communications cannot be obtained through a video camera, including, but not limited to when peripheral intravenous (IV) catheters are inserted into wrists or forearms, when she was in the supine or prone position, or undergoing testing.

15. Throughout SILVA's visits the failure to communicate effectively was noted in the medical record, some of the visits include as follows:

    a. On November 11-12, 2009 visit, BAPTIST staff noted that Ms. SILVA was a "poor historian" as she is "deaf and has to communicate through sign language." BAPTIST physician's report noted that SILVA is deaf, and that the evaluation was limited because SILVA was "having hard time describing sx [symptoms] d/t [due to] a lack of medical vocab." SILVA was only able to partially provide information as staff noted "the quality is noted to be (unable to explain)" and "ros [review of symptoms] largely unobtainable". As a result, BAPTIST staff noted that a work up needed to be done on SILVA, due to poor communication causing trouble obtaining her history.

b. On November 29, 2010 and January 3, 2011, SILVA visited BAPTIST's South Miami Hospital Emergency Department due to chest and abdominal pain where they used her family members to interpret and passed notes back and forth. On January 4, VRI could not be used because it was not operational.

c. On March 26, 2011 and on April 2, 2011, SILVA visited BAPTIST's South Miami Hospital because of a finger injury. Her history was obtained through a family member interpreting, and the discharge instructions were reviewed with a family member, not SILVA.

d. On May 9, 2011, at 5:38 p.m., SILVA visited BAPTIST's South Miami Hospital because of abdominal pain, and she was admitted for acute appendicitis. BAPTIST staff communicated with SILVA via writing for the first two hours, because they noted she was "deaf mute very little lip reading." The VRI machine was not functioning and BAPTIST staff obtained information about SILVA's symptoms and medical history from her family member once they arrived, rather than from SILVA with a qualified interpreter until the VRI machine was operational. However, discharge instructions were done through writing.

e. On May 20, 2011, SILVA returned to BAPTIST's South Miami Hospital due to abdominal pain. BAPTIST provided an unqualified sign language interpreter, who interpreted during the assessment, however, when being discharged, the instructions and medication were communicated to SILVA through a family member and written instructions.

f. On December 20, 2011, SILVA visited BAPTIST's South Miami Hospital because of vaginal bleeding. Rather than providing an interpreter, BAPTIST staff utilized her family member as an interpreter for the entire visit.

g. On April 16, 2012, SILVA visited BAPTIST's South Miami Hospital again. SILVA requested a qualified sign language interpreter, and an unqualified was utilized to provide instructions to SILVA.

h. On September 15, 2012, SILVA visited BAPTIST's South Miami Hospital because of an earache and she requested an ASL interpreter, which BAPTIST staff agreed to provide. While waiting for a interpreter to arrive, staff obtained medical history through SILVA's family member, and communicating via writing with SILVA.

i. On December 6, 2012, SILVA visited BAPTIST's South Miami Hospital because of chest pain. BAPTIST staff noted the evaluation was limited because SILVA is deaf, though she has limited lip reading ability and reading abilities. BAPTIST did not provide a qualified interpreter, and instead used a family member as an interpreter for the entire appointment.

j. On March 4, 2013, SILVA visited BAPTIST because of shoulder pain. BAPTIST used a "sign language monitor" (presumably a video remote interpreting videophone) for a portion of the appointment, however for other topics, SILVA was only provided instructions in writing.

k. On June 11, 2013, SILVA visited BAPTIST because of abdominal pain. According to the records, BAPTIST staff utilized the "language line phone," however they first tried to call multiple times, and it was not working for an unknown period of time.

    l. In February, 2014, SILVA visited BAPTIST with her fiancée. BAPTIST attempted to use video remote interpreting with SILVA, however the machine was very fuzzy, and it was difficult for SILVA to see what was on the screen.  BAPTIST staff were attempting to communicate, through the interpreter who SILVA could not see well on the screen, that SILVA was pregnant.  SILVA was having a very difficult time seeing the interpreter, and could not tell what was being communicated to her.  Eventually, SILVA understood that the interpreter was saying that she was pregnant.

16. At least since February, 2014, SILVA believe that she was pregnant.  During such visit, BAPTIST staff gave up using the video remote interpreting, because it was functioning so poorly. SILVA had to try to communicate through her boyfriend, and primarily through writing back and forth with BAPTIST staff. SILVA had to ask questions about her pregnancy via writing, and try to read the answers.

17. SILVA plans to give birth at BAPTIST's South Miami Hospital.

18. SILVA's numerous visits to BAPTIST's South Miami Hospital over the past four years demonstrates the existence of varying and ongoing medical issues, some of which require continued treatment.

19. BAPTIST's South Miami Hospital is in close proximity to SILVA's home and because of her need for continuing treatment for high blood pressure and the birth of her child, it is certain she will have to return in the near future.

20. The discrimination against SILVA was intentional, with reckless disregard, and with deliberate indifference to her protected rights.

21. SILVA wants to have effective communication through a qualified sign language interpreter at BAPTIST during her delivery in order to ensure that she and her baby receive adequate care.

22. BAPTIST has a pattern and practice of not providing SILVA with a qualified sign language interpreter, using unqualified family members as interpreters for SILVA, attempting to use VRI which staff often do not know how to use and which only functions properly sporadically.

23. SILVA will require an in-person qualified sign language interpreter, not VRI, when giving birth as she will be laying on her back to deliver her child and will be unable to see the VRI screen.

**John Paul Jebian**

24. JEBIAN previously sued BAPTIST for violating the Americans with Disabilities Act effective communications provisions in Access Now v. Baptist Hospital of Miami, Case No. 99-2285, which was settled in 2003.

25. The settlement contained provisions for the deaf and hard of hearing, including the provision that BAPTIST inform the Plaintiffs that BAPTIST provides auxiliary aids, including sign language interpreters, to ensure effective communications with deaf patients and visitors.

26. In the past four years, BAPTIST did not provide any auxiliary aid to JEBIAN when he was a patient, or a visitor.

27. The 2003 settlement also included a provision that BAPTIST would print "Services for Disabled Patients and Visitors" brochures, which would include the international symbol for availability of interpreters.

28. In the past four years JEBIAN was not provided one of the brochures or any other information on the availability of interpreters during his visits at BAPTIST.

29. JEBIAN visited BAPTIST's Baptist Hospital numerous times between 2010 and the present.

**Jebian as a Companion to his Father**

30. JEBIAN visited BAPTIST's Baptist Hospital on several occasions in 2010 to accompany his father who was a patient for heart surgery.

31. During the times JEBIAN accompanied his father to BAPTIST's Baptist Hospital, JEBIAN requested a qualified sign language interpreter.

32. BAPTIST staff denied JEBIAN's requests, and stated that only deaf patients are provided interpreters, not family members accompanying patients.

**Jebian as a Patient**

33. On several occasions, July 11, 2012, July 15, 2012, March 11, 2014, JEBIAN visited BAPTIST's Baptist Hospital as a patient and requested a qualified sign language interpreter, and was denied every time.

34. JEBIAN tried to bring his father with him to appointments, to assist with interpreting, but BAPTIST staff informed him that his father could not provide interpreting for him, because he was also a patient there.

35. JEBIAN had been feeling ill, and felt pain in his chest, and requested that BAPTIST provide a qualified sign language interpreter.

36. JEBIAN's request was denied, as BAPTIST staff stated the only thing they would provide is a Video Remote Interpreting machine ("VRI").

37. None of BAPTIST's staff knew how to set up the VRI, so JEBIAN was unable to use it.

38. Instead, BAPTIST staff communicated with JEBIAN by writing notes with him.

39. After JEBIAN waited several hours, a BAPTIST staff member who handled ADA issues visited JEBIAN and JEBIAN wrote his issues down and requested a qualified sign language interpreter.

40. BAPTIST staff still did not provide a qualified sign language interpreter nor a VRI machine that functioned.

41. JEBIAN was upset, and worried that he had kidney stones and severe chest pain.

42. JEBIAN eventually called a private interpreting service to send an interpreter, and paid for the services himself.

43. With the assistance of a qualified sign language interpreter, JEBIAN was able to understand his treatment plan, ask questions, and communicate effectively while in the emergency room.

44. After the interpreter left, BAPTIST still did not provide a qualified sign language interpreter or VRI.

45. BAPTIST only provided the discharge information to JEBIAN in writing.

46. JEBIAN's numerous visits to BAPTIST's facilities over the past four years demonstrates he and his father have varying and ongoing medical issues, some of which require continued treatment.

47. JEBIAN frequently goes to the Urgent Care facility owned and operated by BAPTIST on SW 40 Street (Bird Road) in Miami, FL and they did not offer JEBIAN a sign language interpreter, or even a video relay interpreting, notwithstanding his requests. JEBIAN's wife, father, or niece provided some communication assistance with the doctors.

48. BAPTIST's Baptist Hospital is in close proximity to JEBIAN's home and because of his need for continuing treatment, it is likely he will have to return in the future.

49. The discrimination against JEBIAN was intentional, with reckless disregard, and with deliberate indifference to his protected rights.

**Background Facts – Baptist**

50. In order to receive Medicaid funding, BAPTIST is required to develop policies and procedures that ensure that persons who are deaf or hard of hearing will receive adequate and effective communication.

51. Each time BAPTIST recertifies for Medicaid funding, it promises that it will provide and adhere to such policies.

52. Upon information and belief, BAPTIST has not provided proper training on the treatment of patients who are hearing impaired.

53. In addition to the suit filed by Jebian, in 2004, Oriol Pavon initiated a lawsuit against BAPTIST, <u>Oriol Pavon v. Baptist Health South Florida, Inc.</u>, Case No. 04-22671-CIV-GRAHAM/O'SULLIVAN.

54. In August 2005, PAVON and BAPTIST entered into a confidential resolution.

55. While BAPTIST has access to qualified interpreters in person, and video interpreting services, upon information and belief, BAPTIST staff have not had proper training on when they must utilize a qualified interpreter, nor is the process streamlined to ensure interpreting services are easily obtained in a timely manner.

56. Notwithstanding past lawsuits and settlements, upon information and belief, BAPTIST staff have not been trained on effective communication with the deaf of how to use video remote interpreting, and the machines are not kept in working order.

57. BAPTIST does not inform hearing impaired persons of the services that are available for the deaf and hearing impaired, and did not inform SILVA or JEBIAN of the availability of these services.

58. SILVA also was not provided one of the brochures or any other information on the availability of interpreters during any of her visits to BAPTIST.

59. CHEYLLA SILVA and JOHN PAUL JEBIAN (hereinafter "DEAF PLAINTIFFS") have retained the services of DISABILITY INDEPENDENCE GROUP, INC. and have agreed to pay them a reasonable fee for their services.

**COUNT I**
**SECTION 504 OF THE REHABILITATION ACT OF 1973, 29 USC § 706**

60. Plaintiffs reallege and incorporate herein the allegations set forth in Paragraphs 1 through 59 above.

61. DEAF PLAINTIFFS are deaf and their disabilities substantially limit their major life activities, including their ability to effectively communicate with others who are not fluent in ASL, therefore, DEAF PLAINTIFFS are considered to be individuals with a disability under Section 504 of the Rehabilitation Act, as amended.

62. BAPTIST is a recipient of federal financial assistance by virtue of receipt of Medicare and Medicaid payments, as well as other federal financial assistance.

63. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, requires that no qualified individual with a disability, on the basis of that disability, be excluded from participation in or be denied the benefit of the services, programs, activities, or to otherwise be discriminated against.

64. During the four years of appointments at BAPTIST, staff noted during each appointment that SILVA is deaf and communicates through sign language.

65. The doctors, nurses and all other employees and staff of BAPTIST who interacted with DEAF PLAINTIFFS had actual knowledge of their disability, yet, during the majority of DEAF Plaintiffs' visits to BAPTIST, they was denied any form of effective communications.

66. By not using a qualified interpreter, BAPTIST does not explain the risks of the procedures, nor permit a deaf patient to ask questions or to have a real understanding of the course of treatment.

67. Because of the failure to provide effective communication, a deaf patient has an incomplete understanding of what was happening during each appointment.

68. DEAF PLAINTIFFS are deprived of the opportunity to ask all the questions they have, and to gain meaningful answers, because they are forced to communicate questions in writing, and do not understand most of the answers they had to read.

69. DEAF PLAINTIFFS ate left feeling frustrated and mistreated after hospitalizations and appointments at BAPTIST.

70. DEAF PLAINTIFFS sign numerous forms, without a qualified interpreter present to communicate the information to them and, as a result, DEAF PLAINTIFFS do not understand what they were signing, or what treatment they are receiving at BAPTIST during their visits.

71. DEAF PLAINTIFFS are not properly informed of the treatment plans, medication risks, and follow up procedures, nor given the opportunity to ask questions that any other non-hearing impaired person would ask.

72. BAPTIST staff indicated awareness that SILVA and JEBIAN was deaf, communicated using sign language, needed an interpreter, and noted difficulties with obtaining medical history from SILVA or JEBIAN when not using a qualified interpreter, but, despite this, BAPTIST failed to communicate with SILVA or JEBIAN through a qualified interpreter during at least a portion of all of their visits.

73. Accordingly, BAPTIST discriminated against SILVA and JEBIAN in the equal use of their facilities and as a result, they experienced mental anguish and humiliation in violation of their civil rights.

74. Further, BAPTIST failed to provide services to SILVA and JEBIAN as they would have provided a similarly situated hearing patient.

75. Defendant's policies, practices and procedures, particularly the actions and omissions described above, violated DEAF PLAINTIFFS' rights under Section 504 of the Rehabilitation Act by discriminating on the basis of a disability.

76. BAPTIST has discriminated against DEAF PLAINTIFFS by failing to provide auxiliary aids and services necessary to ensure effective communication with individuals who are deaf or hard of hearing, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

77. At all times material to this case, the employees, staff and agents of BAPTIST would have been able to communicate effectively with SILVA and JEBIAN, including obtaining accurate history and giving instructions, if BAPTIST had provided qualified interpreter services.

78. BAPTIST staff knew that SILVA and JEBIAN would be harmed by their failure to provide an interpreter.

79. BAPTIST's actions were intentional, with reckless disregard, and with deliberate indifference to the rights and needs of the Plaintiffs herein.

80. As a result of BAPTIST's actions, SILVA and JEBIAN have been damaged and have suffered injuries and experienced emotional suffering, pain and anguish.

81. DEAF PLAINTIFFS will continue to face discrimination at BAPTIST, as BAPTIST is located in close proximity to DEAF PLAINTIFFS.

82. SILVA plans to return to BAPTIST for prenatal care and to give birth, and will likely continue to be denied an interpreter.

**WHEREFORE**, CHEYLLA SILVA and JOHN PAUL JEBIAN respectfully pray that this Court grant the following relief against the Defendants, including entering a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that the Defendant's practices, policies and procedures have subjected Plaintiffs to discrimination in violation of Section 504 of the Rehabilitation Act permanently enjoining the Defendant from any practice, policy and/or procedure which will deny Plaintiffs equal access to, and benefit from the Defendant's services or which deny Plaintiffs effective communication with the Defendant. This includes entering a permanent injunction ordering the Defendant:

   a. To immediately begin providing SILVA with an interpreter to ensure she receives adequate healthcare for the duration of her pregnancy;

   b. To cease discrimination against DEAF PLAINTIFFS and all other deaf or hard of hearing patients;

   c. To promulgate and comply with policies and procedures to ensure that the Defendant and their staff do not discriminate against individuals who are deaf and hard of hearing;

    d. To promulgate and comply with procedures to ensure that the Defendant will provide and pay for interpreter services when needed by individuals who are deaf or hard of hearing in all services offered by the Defendant;

    e. To promulgate and comply with procedures to ensure that the Defendant will notify individuals who are deaf or hard of hearing of their right to effective communication. This notification will include posting explicit and clearly worded notices that state that the Defendant will provide sign language interpreters and/or other communication services that ensure effective communication with deaf or hard of hearing persons.

    f. Award compensatory damages to JEBIAN and SILVA

    g. Award reasonable costs and attorneys' fees; and

    h. Award any and all other relief that may be necessary and appropriate.

## COUNT II
## TITLE III OF THE AMERICANS WITH DISABILITIES ACT, 42 USC § 12181 et seq

83. Plaintiffs reallege and incorporate by reference the allegations of facts in paragraph 1 through 82.

84. DEAF PLAINTIFFS hearing loss substantially limits their major life activities, including their ability to effectively communicate.

85. Therefore, Plaintiffs are individuals with disabilities under Title III of the Americans with Disabilities Act.

86. Plaintiffs meet the essential eligibility requirements for Defendant's services at all times material hereto.

87. DEAF PLAINTIFFS will likely return to the BAPTIST premises in the near future and will be harmed by their discriminatory policies and procedures.

88. Defendant violated Title III of the Americans with Disabilities Act in numerous ways, including discriminatory actions which occurred when they:

    a. Failed to maintain policies and procedures to ensure compliance with Title III of the Americans with Disabilities Act, specifically policies that provide equal access and effective communication to individuals with disabilities; 28 C.F.R. § 36.303(a) (2010).

    b. Failed to ensure that communications with Plaintiffs were as effective as communications with non-disabled patients; 28 C.F.R. § 36.303(a) (2010).

    c. Failed to provide auxiliary aids and services, including a qualified interpreter, and to modify policies and procedures to prevent discrimination against Plaintiffs; 28 C.F.R. § 36.303(a) (2010); 28 C.F.R. § 36.302(a) (2010).

    d. Excluded Plaintiffs from services of the public entity and denied Plaintiffs the benefit of these services due to their disabilities. 28 C.F.R. § 36.202(a) (2010).

89. BAPTIST had knowledge of their obligations under the Americans with Disabilities Act and was deliberately indifferent to the rights of DEAF PLAINTIFFS.

90. BAPTIST knew that DEAF PLAINTIFFS would be harmed by their failure to provide an interpreter.

**WHEREFORE,** CHEYLLA SILVA and JOHN PAUL JEBIAN respectfully pray that this Court enter judgment in their favor to declare that the Defendant's actions and inactions violated Title III of the Americans with Disabilities Act, to permanently enjoin the Defendant from any practice, policy and/or procedure which will deny Plaintiffs equal access to, and benefit from Defendant's services or which deny Plaintiffs effective communication with the Defendant, award further enforcement and other equitable relief to ensure that such training and policies are

maintained in the future, and to award reasonable attorneys' fees and costs, and any and all other relief that may be necessary and appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY FOR ALL ISSUES FOR WHICH A TRIAL BY JURY IS PERMITTED.**

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th of June, 2014 I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served via CM/ECF on this day to: Scott Stephan Allen**,** Jackson Lewis P.C. 2 S Biscayne Boulevard, Suite 3500 One Biscayne Tower, Miami, FL 33131.

DISABILITY INDEPENDENCE GROUP, INC.
2990 Southwest 35th Avenue
Miami, Florida 33133
T: (305) 669-2822 / F: (305) 442-4181
E-Mail: rgoldstein@justDIGit.org

BY:  /s/ Rachel L. Goldstein
     Rachel L. Goldstein, Esq.
     Fla. Bar No.: 0095973
     Matthew W. Dietz, Esq.
     Fla. Bar No.: 0084905