UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

**CHEYLLA SILVA and JOHN PAUL JEBIAN,**

    Plaintiffs,                                    CASE NO. 14-CV-21803

v.

**BAPTIST HEALTH SOUTH FLORIDA,
BAPTIST HOSPITAL OF MIAMI, INC. and
SOUTH MIAMI HOSPITAL, INC.**

    **Defendants.**
_____

### PLAINTIFFS STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiffs, CHEYLLA SILVA ("Silva") and JOHN PAUL JEBIAN ("Jebian") (collectively, "Plaintiffs"), by and through their undersigned counsel, and pursuant to S.D. Fla. L.R. 7.5(c), hereby files their Statement of Undisputed Material Facts and in support states:

**I.    BACKGROUND**

1. Defendant Baptist Health South Florida ("BHSF") owns and operates Defendants Baptist Hospital, Inc. and South Miami Hospital, Inc. as well as several other facilities, including Baptist Medical Plaza at Westchester. Structural and Organizational Chart attached hereto as Exhibit A.

2. BHSF is a recipient of federal financial assistance by virtue of its acceptance of Medicare and Medicaid payments. Deposition Cheylla Silva attached hereto as Exhibit B, p. 55-56.

3. John Paul Jebian ("Jebian") previously sued Baptist Hospital of Miami, Inc. alleging violations of the effective communication provisions of the Americans with Disabilities Act in <u>Access Now et al v. Baptist Hospital of Miami, Inc.</u>, Case No. 99-2285.

4. In February 2003, the <u>Access Now</u> case was settled.

5. In October 2004, Oriol Pavon, who is deaf and communicates in American Sign Language, sued Baptist Health South Florida, Inc. d/b/a South Miami Hospital alleging violations of the effective communication provisions of the Americans with Disabilities Act and the Rehabilitation Act in <u>Oriol Pavon v. Baptist Health South Florida, Inc. d/b/a South Miami Hospital,</u> Case No.: 04-22671. In August 2005, the case was settled.

6. Defendants have been on notice of their obligations under the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973 as it relates to ensuring effective communication for patients who are deaf or hearing impaired for at least ten years.

## II.   DEFENDANTS POLICIES AND PRACTICES

7. For the past five years, the Defendants have adopted the use of an auxiliary aid, "video remote interpreting" ("VRI"), to satisfy their obligation to provide effective communication to patients who are deaf. Deposition Jill Szymanski attached hereto as Exhibit C, p. 25, lines 15-25; p. 26, lines 1-14.

8. Since obtaining the VRI system, defendants' express policy and practice has been not to obtain a qualified interpreter and instead to rely exclusively on the use of VRI to communicate with deaf patients. Id.

### A. BAPTIST HEALTH SOUTH FLORIDA ("BHSF")

9. Baptist Health South Florida has various policies and procedures that apply to its facilities and entities. South Miami Hospital, Baptist Hospital and Baptist Outpatient facilities also have some policies of their own. Deposition Rosie Vasconcelos attached hereto as Exhibit D, p. 62, lines 3-14.

10. Baptist Health South Florida has a computer intranet system, Baptist Health University, which can be assessed by anyone who works at any Baptist Health facility. Exhibit D, p. 9, lines 20-21. It is used to disseminate information to employees through its e-mail system and is where employees can review policies and complete online education and training. Id. at p. 9, lines 5-11; p. 25, lines 8-13.

11. On October 11, 2011, BHSF created a policy entitled Interpreter Services for Patients and/or Family, which states, at the time of registration, patients will be asked to specify the language he or she prefers to use when discussing medical care and treatment. BHSF'S interpreter services policy does not reference services for the deaf or hard of hearing or any steps to ensure effective communication with such individuals. Policy No.: BHSF- 20.00 attached hereto as Exhibit E.

12. On January 13, 2012, Baptist Health South Florida revised its Outpatient Services' policy entitled Interpreter Services for Patients and/or Family to include a provision related to deaf or hard-of-hearing patients, which directs personnel to contact Patient/Guest Services Department

to request a sign language interpreter during regular business hours and for after hours to contact Carmazzi Global Solutions and follow their afterhours procedure. Policy No.: BOS-120.00 attached hereto as Exhibit F.

13. On October 15, 2014, BHSF revised its Outpatient Services' policy entitled Interpreter Services for Patients and/or Family related to deaf or hard-of-hearing patients to include that communication will begin via pen and paper and will be utilized until a sign language interpreter arrives and staff will document in the patient record that communication was assisted by a Sign Language Interpreter. Such policy also refers the employee to Baptist Outpatient Services Language Line Services Form which is to be completed and submitted to the Patient/Guest Services Department and to Baptist Outpatient Services Sign Language Interpreter Procedure for Deaf or Hard-of-Hearing Patients which provides that if a sign language interpreter is needed for a patient, staff can now contact Carmazzi Global Solutions directly. Policy No.: BOS-1315 attached hereto as Exhibit G.

14. Carmazzi Global Solutions is in the Pacific Time Zone with a three-hour time difference from Miami-Dade County and business hours from 9:00am to 5:00pm, Monday through Friday. Id.

**B. BAPTIST HOSPITAL OF MIAMI, INC.**

15. In the Consent Decree entered into in June 2002 in the Access Now et al v. Baptist Hospital of Miami, Inc. case, Baptist Hospital of Miami, Inc. agreed to establish an Auxiliary Aids and Services Policy which includes specific forms to be used for deaf and hard-of-hearing persons at Baptist Hospital and rules related to (1) providing notice to inform any patient, family member or friend of a patient who is deaf or hard-of-hearing of the availability at no cost of qualified interpreters and other auxiliary aids and services to meet his or her communications needs; (2) requiring staff to offer to call a sign language interpreter or provide other appropriate auxiliary aids and services at hospital staff if hospital personnel recognizes or has reason to believe a patient, relative, friend or companion of a patient, or any other person using hospital services, is deaf or hard-of-hearing; (3) requiring any request by the impaired person to use family or friends to interpreter be documented in the patient record; (4) requiring all contacts with interpreting agencies to be documented in patient charts; (5) requiring the use of a qualified sign language interpreter if a person uses sign language in a number of listed situations; (6) advising that family members, friends, advocates, case managers and others who

are at Baptist Hospital to support the patient are not appropriate or qualified interpreters, regardless of their sign language abilities. Consent Decree attached hereto as Exhibit H.

16. The Auxiliary Aids and Services Policy also includes a form to be filled out by the deaf individual which advises that all auxiliary aides and services will be provided free of charge and asks the individual to indicate their communication preference. The form also includes a 'Waiver of Interpreter Services' portion where the individual can acknowledge that they have a right to a free qualified sign language interpreter by Baptist Hospital of Hospital and do not want one and includes a space for the individual to write what method they prefer to use in order to communicate or whether they prefer to use sign language interpreter resources provided by another individual. Id.

17. The forms required for waiver or use of interpreters were never implemented or used at Baptist Hospital. Exhibit C, p. 18-19.

18. On June 23, 2008, Baptist Hospital revised its policy entitled Interpreter Services for Patients and/or Family, which directs staff to contact Patient/Guest Services Department to request a sign language interpreter for deaf or hard-of-hearing patients during business hours and the hospital operator afterhours. Policy No.: BHM-460.07 attached hereto as Exhibit I.

19. On October 17, 2013, Baptist Hospital revised its prior policy and published a policy entitled Accommodations for Patients with Disabilities. Policy No.: BHM-003.10 attached hereto as Exhibit J.

20. Nevertheless, prior to the instant lawsuit the policy was to provide Video Remote Interpreting any time a patient came in and was identified as being deaf or hard of hearing, for example by saying they communicate in American Sign Language ("ASL"), even if the patient preferred a sign language interpreter over the VRI device. Exhibit C, p. 25-26.

**C. SOUTH MIAMI HOSPITAL, INC.**

21. In October 2012, South Miami Hospital disseminated information to all hospital employees with direct patient contact to let them know about a change in the process related to interpretation services. The materials state (1) Video Interpretation is *recommended* for patients who can only communicate in sign language; (2) Video Interpretation is the *preferred* method for deaf patients; (3) Face to Face Interpretation is recommended for patients participating in group sessions; (4) Face to Face Interpretation should be requested with a

*minimum* of 24 hours in advance; (5) the average starting fee for Face to Face Interpretation is $70 per hour with a minimum of two hours with a rate increase depending on the language requested and the time the service is requested; and (6) if a request is cancelled less than 24 hours from the scheduled time, the minimum two hour fee will be charged to the department requesting the service. Accessing Interpretation Services by Rosie Vasconcelos dated October 2012 attached hereto as Exhibit K. (emphasis ours).

22. In July 2014, South Miami Hospital last revised its procedure entitled Accessing Interpretation Services which also states that (1) Video Interpretation Services are recommended for patients who can only communicate in sign language; (2) Face to Face Interpretation is recommended for patients who are participating in group sessions *or* when it is the only method of interpretation accepted by the patient; (3) Face to Face Interpretation *must* be requested with a *minimum* of 24 hours in advance and management approval must be obtained prior to the request; and (4) the average starting fee for this service is $70 per hour with a minimum of two hours which increases depending on the language requested and time when the service is provided. Procedure No.: SMH IP 3100 attached hereto as Exhibit L.

23. VRI is the preferred method of the hospital staff, not the deaf patients, because it is the faster method to communicate since the hospital does not have a live interpreter who works at the hospital. Exhibit D, p. 59, lines 19-25; p. 60, lines 1-7.

III.   **CHEYLLA SILVA**

24. Cheylla Silva is deaf and communicates using American Sign Language ("ASL"). [D.E. 25-2, ¶¶ 3-4].

25. Cheylla Silva has been treated at defendants' facilities numerous times.[1] Declaration of Cheylla Silva Attached hereto as Exhibit M, ¶ 6. Many of her visits have been serious, complex and emotional in nature, include care and treatment related to giving birth and complications

---

[1] Cheylla Silva's visits to South Miami Hospital for medical treatment include in 2006 related to the birth of her first daughter, on March 1, 2009, April 29, 2014, May 19, 2014, July 6, 2014, July 8-10, 2014, July 18, 2014, August 1, 2014, August 22, 2014, September 8, 2014, September 27, 2014. Ms. Silva was treated at Baptist Hospital on November 11-12, 2009, November 29, 2010, January 3, 2011, January 4, 2011, April 2, 2011, May 9, 2011, May 20, 2011, April 16, 2012, September 15, 2012, December 6, 2012, March 4, 2013, June 11, 2013, February 25, 2014, and March 10, 2015.  Ms. Silva was treated at Baptist Hospital West Kendall Urgent Care on March 26, 2011 and December 20, 2011.

related to giving birth, her recent high risk pregnancy, a domestic violence incident, and medical conditions related to her blood pressure and iron. Exhibit M, ¶¶ 12-17, 20.

26. From the time of arrival at defendants' facilities and throughout treatment, Ms. Silva would inform hospital staff that she was deaf and required an interpreter. Declaration of Cheylla Silva attached hereto as Id. at ¶ 7.

27. It is noted numerous times throughout Ms. Silva's medical records that she is deaf. [D.E. 15, ¶ 13].

28. Many times Defendants used Ms. Silva's mother to interpret without her or Ms. Silva's consent. Ms. Silva's mother speaks Spanish as her first language, has no medical training, does not know medical terminology and is not an interpreter. Exhibit M, ¶¶ 8,15.

29. Many times Defendants used Ms. Silva's brother to interpret without his or Ms. Silva's consent. Ms. Silva's brother speaks Spanish as his first language, has no medical training, does not know medical terminology and is not an interpreter. Id. at ¶ 8.

30. Many times Defendants used Ms. Silva's fiancé to interpret without his or Ms. Silva's consent. Ms. Silva's fiancé is hard of hearing, does not know medical terminology and is not an interpreter. Id.

31. Many times Defendants attempted to communicate with Ms. Silva through writing short notes. Id.

32. Ms. Silva was unable to understand most of what hospital staff attempted to communicate and did not have the opportunity to ask questions. Id. at ¶¶ 8-9.

33. On some occasions, hospital staff would use VRI to communicate with Ms. Silva. Oftentimes the machine was inoperable or unusable. Sometimes it appeared the staff did not know how to operate the machine. Other times, the picture would be blocked, frozen or degraded. Id. at ¶ 10.

34. After the filing of this lawsuit, defendants entered into a consent settlement requiring in-person interpreters for Plaintiff Cheylla Silva's birth at South Miami Hospital. [D.E. 33-1].

35. From the beginning of her pregnancy, Ms. Silva was scheduled to give birth at South Miami Hospital. However, on an emergency basis Ms. Silva was rushed by ambulance to Kendall Regional Hospital, through no choice of her own, where she gave birth to her daughter. Exhibit M, ¶ 19.

36. Since giving birth, Ms. Silva has been required to make numerous visits to Defendants' facilities for medical care and treatment and will continue to receive treatment there in the near future. Id. at ¶¶ 20-22.

37. Ms. Silva has also been to Baptist Hospital and South Miami with her daughter Zoey in the past 60 days. Exhibit B, p. 136, lines 8-25; p. 137, 1-4.

38. Ms. Silva continues to go back to South Miami Hospital for medical care as they know her and her medical history and she is more comfortable there. Id. at p. 139, lines 2-21.

### IV. JOHN PAUL JEBIAN

39. John Paul Jebian is deaf and communicates using American Sign Language. Declaration of John Paul Jebian attached hereto as Exhibit N, ¶ 3.

40. Mr. Jebian has been treated as a patient and accompanied his father as a companion at defendants' facilities numerous times between 2010 to the present.[2] Id. at ¶¶ 6, 12. Many of his visits have been serious, complex and emotional in nature, including when his father had a heart attack and heart surgery. Exhibit O, p. 216, lines 15-17.

41. At his hospitalizations and visits, Mr. Jebian requested a sign language interpreter. Id. at ¶¶ 7, 13.

42. Mr. Jebian's request was denied by Baptist Hospital and Mr. Jebian was told that only deaf patients would be provided interpreters, not family members accompanying patients. Deposition John Paul Jebian attached hereto as Exhibit O, p. 249, lines 7-25; p. 250, lines 23-25; p. 251, lines 1-3. Declaration Jebian, ¶ 15.

43. Many times Defendants attempted to communicate with Mr. Jebian through writing short notes. Exhibit N, ¶ 8.

44. Mr. Jebian was unable to understand most of what hospital staff attempted to communicate and did not have the opportunity to ask questions. Id. at ¶¶ 8-9.

45. Hospital staff attempted to use VRI to communicate with Mr. Jebian. The machine was inoperable or unusable. The staff did not know how to operate the machine. The picture appeared to be blocked, frozen or degraded. Id. at ¶ 10.

---

[2] Mr. Jebian accompanied his father to Baptist Hospital on dates including March 29, 2010, November 5, 2010. Mr. Jebian was treated at Baptist Hospital on dated including July 11, 2012, July 15, 2012 and March 11, 2014. Mr. Jebian has also been treated several times at Baptist's Westchester Urgent Care Center.

46. Defendants attempted to use VRI in situations where effective communication could not be obtained through a video camera included when peripheral intravenous (IV) catheters were inserted in Mr. Jebian's wrists or forearms and in emotional and sensitive situations. Exhibit O, p. 33, lines 22-25; p. 34-35.

47. While a patient at Baptist Hospital, after requesting an interpreter and not being provided with one, Mr. Jebian eventually called a local sign language interpreting service, Accessible Communication for the Deaf ("ACD"), to send him an interpreter and paid for the services himself. Id. at p. 329, lines 18-25.

48. Mr. Jebian will likely visit and receive treatment at Defendants facilities in the future and will likely accompany his father to defendants facilities for his ongoing care and treatment. Exhibit N, ¶¶ 16-17.

## VII.  VIDEO REMOTE INTERPRETING

49. A video remote interpreting ("VRI") device uses video conferencing technology to provide remote interpreting services. [D.E. 44-2, p. 6].

50. On various occasions, the VRI at defendants' facilities has failed to work effectively due to the lack of sufficient internet connection or due to the failure of adequate training on its use. Exhibit M, ¶ 10. Exhibit N, ¶ 10. Exhibit C, p. 55, p. 61, lines 21-25, p. 62, line 1.

51. Defendants are upgrading from their current vendor, Cisco's wireless infrastructure to a new wireless infrastructure with Meru. Deposition Chuck Chickoree attached hereto as Exhibit P, p. 14, lines 15-20.

52. There is no wireless connectivity in the MRI area, CT Scan and magnetic imaging areas as anything that has magnetic influence affects the signal strength. Id. at p. 17, lines 17-25; p. 18- 1-9.

53. Defendants have a separate guest network and hospital network. Patients can use the guest network and share the bandwidth with whoever else is utilizing the network; if other people are using too much bandwidth you will not be able to get on it. Id. at p. 28, lines 18-21; p. 29, lines 9-19.

54. The network systems run through access points located throughout the hospital. The bandwidth depends on what the system runs on, for example if the access point is one gig, it allows usage to one gig. Id. at p. 31, lines 8-16.

55. The bandwidth to the router remains the same whether using the LAN to LAN or the MPLS circuit. Id. at p. 51, lines 20-23.

56. Even though you have the guaranteed bandwidth, once it gets into the MPLS system there is no way to guarantee that amount will be permitted through the access point because other clinical equipment or people using other devices may take that bandwidth going into the access point. Id. at p. 36, lines 15-25; p. 37, lines 1-3.

57. Voice, primarily for the use of wireless Ascom phones by hospital staff for medical clinical services, is given priority across the wireless bandwidth and means that such calls never have to be retransmitted. Id. at p. 23, lines 24-25; p. 24, lines 1-15. Everything else is given priority after that. Id. at p. 25, lines 1-2; p. 27, lines 10-12.

58. Clinical equipment including IV pumps and a blood monitoring system, i-STAT, are also connected to the hospitals Wi-Fi network. Id. at p. 38, lines 5-12.

59. There are no security protocols in place which affect the Video Remote Interpreting equipment. Id. at p. 34, lines 9-12.

60. Language Access Network ("LAN") is defendants' provider of Video Remote Interpreting Services. Exhibit D, p. 26, line 25; p. 27, line 1.

61. On some occasions, the Defendants insist on using VRI in situations where such use would be inappropriate. Examples of situations in which using VRI is inappropriate include when the patient cannot clearly see the screen due to the position of the patient, the patient's hands could not be seen, where there are visual issues for a Deaf patient, mental or cognitive issues, there are multiple participants, for complex or complicated content terminology, or for a highly emotional or sensitive situation. See Language Access Network documents attached hereto as Exhibit Q. [D.E. 44-1, p. 6]; [D.E. 44-2, p. 6].

62. The Registry of Interpreters for the Deaf, Inc. ("RID") published Standard Practice Papers which outline standard practices and positions on various interpreting roles and issues related to the Deaf community. RID's standards related to Video Remote Interpreting recognize that there are benefits and limitations to use of the VRI, and while it may provide a viable option for interpreting services, VRI is not a comprehensive replacement for onsite interpreting. Registry of Interpreters for the Deaf, Inc. Standard Practice Paper Video Remote Interpreting attached hereto as Exhibit R.

63. The deaf person must be in a position where they can clearly view the interpreter and the interpreter can view the deaf consumer's signing space and vice versa. [D.E. 44-1, p. 7].

64. The video interpreter, who is located at a remote location, is often unable to differentiate each individual's voice coming from the room where the deaf person is located which can prevent the deaf individual from understanding what is being said and by whom. Id.; [D.E. 44-2, p. 7].

65. Defendants acknowledge that the VRI is choppy, and even needs to be moved around the room like a cell phone to get reception. Exhibit C, p. 33, lines 4-13. Exhibit D, p. 103, lines 14-25; p. 104, lines 1-3, 13-18; p. 109, lines 8-25; p. 111, lines 22-25; p. 112, lines 1-4.

66. In July 2014, Director of Patient and Guest Services at South Miami Hospital, Rosie Vasconcelos sent e-mail correspondence to hospital staff about Plaintiff Cheylla Silva's medical care related to her pregnancy advising that she requires sign language interpretation and is expected to deliver her baby but has been to the hospital several times and will likely continue to do so prior to giving birth. Such correspondence directs staff to move the VRI around like a cell phone to obtain the best connection and if the VRI freezes once the interpreter is on the screen to disconnect, dial again and ask for an interpreter located at another call center. E-Mail Correspondence attached hereto as Exhibit S.

67. Now that defendants inquire into the effectiveness of the VRI by asking patients and their families about it, they have received feedback stating the VRI does not connect or the picture may be choppy. Exhibit C, p. 61, lines 21-25; p. 62, line 1.

68. However, VRI is used, even when inappropriate, or contrary to the interpreting company's standards, unless the patient specifically requests an in person interpreter. Exhibit C, p. 52-53.

**VIII. CHANGES SINCE CONSENT SETTLEMENT**

69. Finally, in or around October 2014, defendants hired a local sign language interpreting service, Accessible Communication for the Deaf ("ACD") to obtain certified interpreters. ACD assures that interpreters will be provided to defendants facilities within two hours of being called and on most calls, an interpreter can be available within 30 minutes. Declaration of Lisa Campbell attached hereto as Exhibit T. However, defendants still have policies requiring an in-person interpreter to be requested with a *minimum* of 24 hours in advance. Exhibit L.

70. Despite defendants' contention that its policies related to interpretation services for the deaf and hard of hearing were going to be revised, they have not changed.

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 3, 2015, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notice of electronic filing to Eric Isicoff, Esq.; and Christopher M. Yannuzzi, Esq., Isicoff, Ragatz & Koenigsberg, 1200 Brickell Avenue, Suite 1900. Miami, Florida 33131.

Disability Independence Group, Inc.
2990 Southwest 35th Avenue
Miami, Florida 33133
T: 305-669-2822
F: 305-442-4181
Email: rgoldstein@justDIGit.org

By: s/ Rachel L. Goldstein
Rachel L. Goldstein, Esq.
Florida Bar No.: 0095973