UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 14-CV-21803-WILLIAMS

CHEYLLA SILVA and JOHN PAUL JEBIAN,

     Plaintiffs,

vs.

BAPTIST HEALTH SOUTH FLORIDA, INC.,
BAPTIST HOSPITAL OF MIAMI, INC., and
SOUTH MIAMI HOSPITAL, INC.,

     Defendants.

_____/

## ORDER

**THIS MATTER** is before the Court on the Parties' fully briefed motions for summary judgment.[1]  (DE 60; 62).  Defendants—two local, non-profit hospitals and their non-profit parent company—succeeded in treating Plaintiffs[2] Cheylla Silva and John Paul Jebian, but failed to provide in-person American Sign Language ("ASL") interpreters when Plaintiffs thought they were needed.  Plaintiffs sued Defendants under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of 1973 (the "RA"), asserting that Defendants discriminated against them on the basis of their

---

[1] Plaintiffs' motion is partial, "request[ing] that the Court enjoin the Defendants' practices and policies of its use of VRI when such use does not allow effective communication."  However, the Parties have chosen to incorporate their arguments and facts by reference, making it practical for the Court to address both motions together.  Moreover, as discussed in detail below, the Court's determination concerning the alleged violations and Plaintiffs' standing to seek injunctive relief is dispositive of both summary judgment motions.

[2] Plaintiffs are not family members or friends.  They did not accompany each other to Defendants' hospitals; in fact, they never visited the same hospital within one week of each other.  The only things they share in common are the use of ASL to communicate during doctors' visits, their belief that in-person interpreters are required in many treatment scenarios, and this lawsuit. The Court previously addressed these issues at a hearing on Defendants' motion to sever Silva's claims from Jebian's for trial.  (DE 54).  The Court granted the motion and severed the claims.  (DE 55).

disability when Defendants used video remote interpreting ("VRI") instead of providing an in-person interpreter.

## I.   <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case.  An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *U.S. ex rel. Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015) (quoting *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014)).  Rule 56(c)(3) provides that "[t]he court need consider only the cited materials, but it may consider other materials in the record."

After the movant has met its burden under Rule 56(c), the burden shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party "may not rely merely on allegations or denials in its own pleading," but instead must come forward with "specific facts showing a genuine issue for trial." FED. R. CIV. P. 56(e); *Matsushita*, 475 U.S. at 587.  "Thus, to survive summary judgment, the nonmoving party must offer more than a mere scintilla of evidence for its position; indeed, the nonmoving party must make a showing sufficient

to permit the jury to reasonably find on its behalf." *Urquilla-Diaz*, 780 F.3d at 1050

(citing *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir.

2006)).

In evaluating a defendant's motion for summary judgment, the Court views all

the evidence in the light most favorable to the plaintiff and resolves all reasonable

doubts about the facts in favor of the plaintiff. *See Liese v. Indian River Cty. Hosp.*

*Dist.*, 701 F.3d 334, 337 (11th Cir. 2012).  The Court draws "[a]ll reasonable inferences

arising from the undisputed facts" in favor of the nonmovant plaintiff, however an

"inference based on speculation and conjecture is not reasonable." *Chapman v. Am.*

*Cyanamid Co.*, 861 F.2d 1515, 1518 (11th Cir. 1988).  Furthermore, a court need not

credit a plaintiff's uncorroborated assertions, even if sworn, concerning defendant's non-

compliance with applicable disability laws. *Gomez v. Dade Cty. Fed. Credit Union*, 610

F. App'x 859, 862, 864–65 (11th Cir. 2015).  And the mere proffer of experts does not

immunize factually deficient claims.  In the context of a qualified immunity analysis, the

Supreme Court recently observed that "a plaintiff cannot avoid summary judgment by

simply producing an expert's report." *City & Cty. of San Francisco, Calif. v. Sheehan*,

135 S. Ct. 1765, 1777 (2015) (internal quotation omitted).  Accordingly, "[w]here the

record taken as a whole could not lead a rational trier of fact to find for the non-moving

party, there is no genuine issue for trial." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646

(11th Cir. 1997) (quoting *Matsushita*, 475 U.S. at 587).

## II.   <u>BACKGROUND</u>

Plaintiffs contend that, although VRI may be used as an auxiliary aid to facilitate

communication, Defendants' persistent use of VRI in situations where it is not suited to

3

the task (either because of technical deficiencies or practical limitations) violates federal disability law.  Plaintiffs seek to enjoin Defendants from providing medical care without in-person ASL interpreters available and seek damages based on Defendants' deliberate indifference to their federally protected rights.

Both Plaintiffs include the same statement in their declarations supporting their motion for partial summary judgment: "without a clear and fluid exchange of information, symptoms I'm experiencing could go undiagnosed or misdiagnosed, I could receive the wrong medical treatment, or no treatment at all, and/or I would lack the necessary information to ensure proper follow-up care for me or my [children or family]."  (Silva Mar. 18, 2015 Declaration DE 61-13 ¶ 5; Jebian Mar. 18, 2015 Declaration DE 61-14 ¶ 5).  However, these possibilities are merely speculative.  There is no specific fact—or any evidence outside of Plaintiffs' conclusory general testimony—demonstrating that either Plaintiff was misdiagnosed, was given the wrong medical treatment, was impeded in complying with medical instructions for follow-up care, or was otherwise denied equal aid, benefit, and service as a result of ineffective communication with Defendants' staff.

Plaintiffs aver repeatedly—but without providing specifics—that VRI and any auxiliary aids other than an in-person interpreter did not, in the parlance of the regulations, ensure effective communication.  For example, Silva states generally that she was "unable to understand most of what hospital staff attempted to communicate," but does not say what, with the benefit of hindsight, was unclear or misunderstood at the time.  (Plaintiffs' statement of undisputed material facts DE 61 ¶ 32).  Silva supports her vague assertions with citations to her own declaration (*see, e.g.* DE 61 ¶ 32 (citing

Silva Mar. Decl. DE 61-13 ¶¶ 8–9)) or her own deposition (*see, e.g.*, DE 61 ¶ 37 (citing Silva Mar. 16, 2015[3] Deposition DE 61-2 136:8–25)).  John Paul Jebian does the same: "Mr. Jebian was unable to understand most of what hospital staff attempted to communicate."  (*See, e.g.*, DE 61 ¶ 44 (citing Jebian Mar. Decl. DE 61-14 ¶ 8); DE 61 ¶ 46 (citing Jebian Dec. 1, 2014 Deposition DE 61-15 33:22–34:14) ("Defendants attempted to use VRI in situations where effective communication could not be obtained.")).  Yet Plaintiffs are unable to point to any specific fact, incident, course of treatment, or diagnosis supporting the conclusion that communication at Defendants' hospitals was ineffective.

   a.  **The VRI System at Defendants' Hospitals**

   Defendants[4] are Florida non-profit corporations engaged in the business of providing healthcare services.  (Defendants' statement of undisputed material facts, DE 59 ¶ 1).[5]  The parent organization, Defendant Baptist Health South Florida, Inc., does not provide any healthcare services.  *Id.*  Healthcare services are provided by the individual hospitals, including Defendants Baptist Hospital of Miami, Inc. and South Miami Hospital, Inc.  (*Id.*).  Defendants have promulgated policies for the provision of

---

[3] The Silva deposition began on March 16, 2015 and continued on March 18, 2015.  The Jebian deposition began on December 1, 2014 and continued on March 18, 2015.  However, each Party has excerpted different parts of the same depositions without differentiating which deposition they are referring to based on date.  Accordingly, there are multiple docket entries for excerpts from the Jebian and Silva depositions.

[4] Plaintiffs make reference to non-party Baptist Outpatient Services, Inc., a Florida non-profit corporation for which Defendant Baptist Health provides certain administrative support.  (Jill Szymanski Apr. 6, 2015 Declaration DE 63-1 ¶ 3).  Non-party Baptist Outpatient Services is the entity responsible for the provision of health services at Westchester Urgent Care and West Kendall Urgent Care, but is not a named party.  *Id.*

[5] Unless otherwise noted, the facts presented are not materially disputed.

interpreter services for the deaf.  (*Id.* ¶ 3).[6]  Those policies provide for a range of services to assist deaf patients and their family members with effective communication.[7] (DE 59 ¶ 7).  One of those services is an in-person interpreter.  *Id.*  Another is VRI where a live ASL interpreter facilitates communication via mobile video equipment.  *Id.* ¶¶ 7, 9.

When utilizing VRI, a sign language interpreter is located remotely.  *See Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d 636, 638 n.2 (D. Md. 2005) (describing the use of VRI).  Facing a small camera mounted on top of a computer monitor, the deaf individual signs to the interpreter, who then voices what has been signed to hearing participants.  *Id.*  The interpreter then signs the hearing participants' response so that the deaf individual can view the response on the monitor.  *Id.*

To provide VRI services to deaf and hard of hearing patients and their companions, Defendants use a third party called Language Access Network ("LAN").[8] *Id.* ¶¶ 8, 17.  Two network engineers are primarily responsible for maintaining the wireless internet network infrastructure, which works the same at both of the Defendant

---

[6] Plaintiffs dispute this reference because the "citation provided does not indicate the purpose of the policy." (DE 78 ¶ 3).  This is perplexing; the first page of the policy contains a section titled "summary and purpose" that includes the language quoted by Defendants. (DE 59-4 at 107–08; DE 61-5 at 1–2).

[7] Plaintiffs counter that "Defendants' express policy and practice has been not to obtain qualified live, in-person American Sign Language ('ASL') interpreter and instead to rely exclusively on the use of VRI to communicate with deaf patients." (Plaintiffs' response to Defendants' material facts, DE 78 ¶ 7).  This citation to a collection of excerpts from the deposition of Jill Szymanski, Assistant Vice President of the Center of Innovation at Baptist Health South Florida, Inc. and Assistant Vice President for Performance Improvement at Baptist Hospital of Miami, Inc., does not support Plaintiffs' contention that VRI is used to the exclusion of all other auxiliary aids or accommodations. (Szymanksi Jan. 14, 2015 Deposition DE 78-2 at 9–21).  Accordingly, the Court treats the fact that a range of services, including in-person interpretation and VRI, are used at Defendants' hospitals as undisputed.  See FED. R. CIV. P. 56(e) (when a party "fails to properly address another party's assertion of fact . . . , the court may: . . . consider the fact undisputed for purposes of the motion [or] grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it").

[8] Non-party Language Access Network is not to be confused with the wireless internet network that is required to operate the VRI system.

hospitals. *Id.* ¶¶ 15-16.  One of the network engineers connected the VRI machines to the network "approximately six or seven years ago."  *Id.* ¶ 17.  Defendants assert that they follow "all recommendations provided by LAN regarding specifications and connectivity.  *Id.* ¶ 18.  Plaintiffs dispute—without mention of or reference to specifications or connectivity—that Defendants follow Language Access Network protocols because Plaintiffs claim that Defendants used and continue to use VRI in situations that Plaintiffs deem "inappropriate."  (Plaintiffs' responsive facts DE 78 ¶ 18).

    Save for Plaintiffs' allegations, there is no evidence that the network infrastructure has been anything other than generally "sound" during the time that the VRI machines have been connected to it.  (DE 59 ¶ 16).  The network engineers' department "continually monitors and upgrades its network and equipment . . . to keep it reliable and stable."  *Id.*  According to testimony adduced during the deposition of Defendants' network engineer, there was an isolated incident in July 2013 when the hospital staff called the network engineers to fix the VRI "because they thought it may have been a network issue."  (Vazquez Feb. 4, 2014 Deposition DE 59-8 17:1–13).  The problem had nothing to do with the network: it was "the battery that was dead."  *Id.*  That one occasion was when Silva came to South Miami Hospital complaining of back and leg pain.  (DE 59 ¶¶ 87, 123; Vazquez Depo. DE 59-8 66:3–67:8).  Tellingly, Silva did not mention this visit in her deposition or declarations.

    Plaintiffs also dispute that the same wireless bandwidth is available in every part of Defendants' hospitals.  (DE 78 ¶ 16; 78-8).  But again, with the exception of Plaintiffs' assertions, there is no evidence that a variation in wireless bandwidth prevented effective communication.  Plaintiffs do not counter Defendants' point that the network is

designed to guarantee that the VRI system receives adequate bandwidth and that there is always 80% bandwidth available because "only 20% of available bandwidth is used at any given time." (DE 59 ¶ 16; 78 ¶ 16). Plaintiffs do challenge the result of the network engineer's inspection that the "wireless signal [at South Miami Hospital] was 'optimal,'" because they contend that not every part of the hospital was evaluated. (DE 59 ¶ 19; 78 ¶ 19). However, Plaintiffs' expert never inspected the hospitals' networks and Plaintiffs present no facts that undermine or contradict Defendants' contention regarding sufficient bandwidth availability.[9] (DE 78 ¶¶ 16–19). Thus, there is no credible evidence that a lack of bandwidth was a contributing cause of ineffective communication.

### b. Cheylla Silva

Silva's allegations in the amended complaint, at her deposition, and in her subsequently filed declarations, provide very little relevant detail regarding her experience communicating and being treated at Defendants' hospitals during the relevant time period. Except for the specific visits discussed by the Court below, the elements of Silva's claims are supported only by conclusory statements.[10] For example, she says that she has been a patient at Defendants' hospitals "on many occasions since 2006" and, "[a]t each such hospitalization or visit," that she requested an in-

---

[9] Plaintiffs' proffered expert, Mavis D. Scott, never tested Defendants' network or conducted an inspection of their specific VRI system. When Plaintiffs moved to compel an inspection, Magistrate Judge Simonton found their request for inspection to be untimely. (DE 88). Accordingly, Scott's testimony regarding the adequacy of Defendants' VRI system lacks sufficient basis to be an admissible expert opinion and the Court declines to consider it here. *See Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014) (citing *Daubert*, 509 U.S. at 597).

[10] Plaintiffs were given multiple opportunities by the Court to identify the specific instances and details of ineffective communication, but they were unable to do so either at hearings or in written submissions. (*See, e.g.*, Sept. 14, 2015 order granting Plaintiffs' motion for hearing DE 129).

person interpreter to help her communicate.  (Silva Mar. Decl. DE 61-13 ¶¶ 6–7). Although she concedes that, "[o]n some occasions, an interpreter was provided," she asserts that she "was unable to understand most of what [hospital staff] attempted to communicate" to her via friends and family and written notes and gestures.  *Id.* at 7–8. Silva also testifies that "she did not fully understand" treatment and medications, but she does not identify what treatment and medication she is talking about, the complexity and severity of the condition they were meant to treat, when they were administered, or the results of those treatments.  *Id.* at 9.

Silva testifies generally that the VRI "machine was inoperable or unusable," but provides no specific dates in her declaration.  *Id.* at 10.  She further testified that "sometimes," the staff had trouble using the machine and "[o]ther times, the picture would be blocked, frozen, or degraded."  *Id.*  Although Silva's deposition testimony adds some detail regarding dates of hospital visits and her preference for in-person interpreters, it does not demonstrate how Silva was unable to effectively communicate with Defendants' staff during these visits on these dates.

On January 4, 2011, Silva went to Baptist Hospital because of "stomach pain," but the VRI did not function properly.  (Silva Depo. DE 59-1 262:9–23).  Because the VRI did not work for a time on that day, the hospital provided Silva with an in-person interpreter.  *Id.*  Before the interpreter arrived, Silva and a nurse "wrote back and forth for a while," by "using paper and pen to describe [her] symptoms."  *Id.* at 262:18–23. Silva was "treated and discharged from the hospital."  *Id.* at 263:7–9.

While Silva alleges that the VRI did not function on a May 20, 2011 visit to Baptist Hospital for "abdominal pain," she testified in her deposition only that there was

9

trouble setting up the VRI.  *Id.* at 274:15–275:7.  The robust clinical report generated during that visit to Baptist Hospital belies any claim that Silva could not effectively communicate.  (May 20, 2011 Baptist Hospital Clinical Report DE 59-1 at 223–227).  Defendants' staff noted Silva's chief complaint ("abd[ominal] pain"; "flank pain"), onset of symptoms ("started yesterday"), severity of condition ("[a]t its maximum, severity described as moderate"), and information available in the outpatient context only through patient reporting ("[n]o abnormal bleeding, bloody stools, fever, headache, or sore throat.").  *Id.* at 223.  After Defendants completed lab work and determined Silva's condition was stable, Silva was directed to continue taking her current medications and discharged.  *Id.* at 226.  The notes specifically reflect that Silva's "concerns were addressed" and "understanding of the discharge instructions [was] verbalized by patient."  *Id.* at 226–27; (May 20, 2011 instructions page bearing Silva's signature DE 59-1 at 230).

   With regard to her 2014 pregnancy, Silva states in her declaration that an in-person interpreter was unavailable when she arrived at South Miami Hospital at 12 a.m. and "the VRI would not work."  (Silva Mar. Decl. DE 61-13 ¶¶ 17–18).  However, her deposition testimony—taken on March 16 and 18, 2015—contradicts the version of events set forth in her declaration, which was signed on March 18, 2015.  Although Silva describes the July 8, 2014 visit to South Miami Hospital as an occasion when the VRI image froze, Silva's only specific recollection of that visit, aside from experiencing premature contractions, was that Defendants "actually had a live sign language interpreter in the hospital 24 hours with me at the hospital."  (Silva Depo. DE 59-1 327:16–22).

At her next visit, on July 18, 2014, Silva again arrived at South Miami Hospital with pregnancy complications.  *Id.* at 328:22–329:5; (DE 59 ¶ 111).  Again, Defendants provided her with an in-person interpreter when she insisted on one despite the fact that "the VRI was working properly during that visit." (Silva Depo. DE 59-1 at 330:17–331:8).

In support of the conclusion that Defendants did not ensure effective communication, Silva's April 26, 2015 supplemental declaration sets forth a single instance from the relevant time period where the VRI failed to reliably connect.  (DE 78-9).  With regard to a March 9, 2015 visit to Baptist Hospital to treat a respiratory infection, Silva's first declaration stated only that she was not provided an in-person interpreter and that she had to use her father to interpret, who is not trained as an ASL interpreter.  (Silva Mar. Decl. DE 61-13 ¶ 21).  Silva did not explain what information she was unable to effectively communicate.  *Id.*  Then, in her supplemental declaration, she states that during the March 9, 2015 visit, the VRI worked inconsistently for over an hour.  (Silva Apr. Decl. DE 78-9 ¶¶ 9, 13).  Although Silva was unable to communicate regarding her mild breathing difficulty for a time, "[o]nce the VRI became operational, [she] used the VRI to communicate until a live interpreter . . . arrived at the hospital." *Id.* ¶¶ 16-17 ("I wanted to know what they were saying, I couldn't explain how I felt and I saw the nurses talking and I didn't know if they were talking about me and it was something bad.").  Consequently, notwithstanding the fact that the VRI did not work correctly at the outset of the visit, there is no evidence that this brief lapse affected Silva's medical outcome in any way.  *Id.*; (*see also* Silva Depo. DE 59-1 341:15–342:5).

To the contrary, her medical records again indicate that effective communication took place. (Mar. 9, 2015 Baptist Hospital Clinical Report DE 86-1 at 18–26). Defendants' staff noted Silva's chief complaint ("chest pain"), onset of symptoms ("started today . . . abrupt in onset"), severity of condition ("[a]t its maximum, severity described as mild"), and information available in the outpatient context only through patient reporting ("[n]o bloody stools"). *Id.* at 18. After x-rays were taken, lab work was completed, and the results were reviewed, Silva's condition was judged to be good and she was sent home with medication. *Id.* at 22. Again, the notes reflect that Silva and her family "verbalized understanding" of the discharge instructions after the nurse had "[r]eviewed medication side effects, precautions, dosing and course." *Id.* at 26, 28; (Mar. 9, 2015 instructions page bearing Silva's signature DE 86-1 at 28).

Silva's citations to the record regarding violations by a non-party, legal theories not pleaded, or time-barred claims do not discharge her Rule 56 burden.[11] On one occasion (there was no specific date identified) Silva said she could not effectively inquire about medication that was prescribed to her on a discharge form. (Silva Depo. DE 59-1 176:6–177:21). As a result, Silva contends that she was unable to address

---

[11] Events taking place prior to May 15, 2010 are time-barred. Neither the ADA nor the RA expressly provides a statute of limitations. *Everett v. Cobb Cnty. Sch. Dist.*, 138 F.3d 1407, 1409 (11th Cir. 1998). But where a federal statute does not contain a limitations period, courts should look to the most analogous state statute of limitations. *Id.* (citing *Wilson v. Garcia*, 471 U.S. 261, 266–67 (1985)). The Eleventh Circuit and most other circuits, "look to the state's limitations period for personal injury actions." *Id.* Florida Statute § 95.11(3) provides that Plaintiffs' damages claims are limited to events in the four years before they filed their complaint. *Cardelle v. Miami-Dade Police Dept.*, Case No. 14-22753-CIV, 2014 WL 4907702, at *2 (S.D. Fla. Sept. 30, 2014) ("In Florida, the statute of limitations for personal injury claims is four years."). Here, the original complaint was filed on May 16, 2014. (DE 1). Thus, events taking place prior to May 15, 2010 are time-barred by the statute of limitations. Although such events could be relevant evidence in a deliberate indifference analysis, they cannot create an issue of material fact regarding the threshold question of whether Defendants violated the ADA or RA during the statutory time period.

the issue of the mistakenly prescribed medication.[12]  *Id.* at 177:11–21.  This ineffective communication, whenever it took place, is irrelevant because it did not happen at either of the Defendant hospitals.  *Id.* at 187:11–188:5.  Rather, it transpired at non-party Miami Children's Hospital.  *Id.* at 188:4–5.

Another visit set forth in Silva's April 2015 Declaration concerns her inability to communicate with staff at Baptist Hospital while Silva was accompanying her daughter.  (DE 78-9 ¶ 18).  But the amended complaint does not contain any claims that the Defendant hospitals violated Silva's rights under the ADA and RA that arise out of her visits as a companion.  (*See generally* DE 12).  Accordingly, the Court will not consider a factual proffer regarding claims not pleaded in the operative complaint.[13]

---

[12] Despite Silva's contention that she can only "write English for very basic communication and reads on a 5th grade level," she discovered the error in her prescription medication via internet research.  (DE 78 ¶ 81).

> Silva:  I looked at the medication.  I said, I don't think that's the correct medication.  I did my own research on the internet, and I found out that that was not the correct medication they gave me.  And I showed the doctor, and he said, oh, they gave you the wrong medication.

Silva Depo. DE 59-1 176:11–17.

> Attorney:  So on your own, without the assistance of a sign language interpreter or a medical consultant or anybody, you went on the internet, did your own research, and determined that the medicine was not the right medicine for you.  Correct?

> Silva:  Correct.

*Id.* at 187:11–16.

[13] The Court makes this determination after having reviewed Judge Simonton's discovery ruling where she found that those medical records were discoverable, inter alia, because Silva would have had the right to obtain them independent of this case.  (DE 88).  Judge Simonton specifically noted that her ruling did not constitute a ruling on the admissibility of those records at trial or for summary judgment purposes.  *Id.* at 4-5; *see also Menzie v. Ann Taylor Retail Inc.*, 549 F. App'x 891, 896 (11th Cir. 2013) (internal quotations omitted) ("The law is well-settled in this circuit that a plaintiff may not amend her complaint through argument in a brief opposing summary judgment.") (collecting cases).

Finally, Silva's declaration testimony regarding a 2006 hospital visit does not support claims of ADA and RA violations because it is clearly time-barred: "As a result of Defendants' failure to provide an ASL interpreter, I did not know the specifics of my progress or even what was happening while giving birth. I was confined to lying on my back, surrounded by hospital staff, and connected to IVs, without any communication." (Silva Mar. Decl. DE 61-13 ¶¶ 12, 16).

   c. **John Paul Jebian**

The allegations advanced in Jebian's declarations and deposition testimony are similar to Silva's in most respects. However, in addition to echoing Silva's general assertions that she requested, but did not receive in-person interpretation services at Defendants' hospitals, Jebian also testifies in support of his claim in the amended complaint that he was denied appropriate auxiliary aids while accompanying his father to Defendants' hospitals. (Jebian Mar. Decl. DE 61-14 ¶¶ 12–13). According to Jebian, despite his frequent requests, "no ASL interpreter was present and one was not provided" when Jebian accompanied his father—who is not deaf. *Id.* ¶ 14. Jebian states in his second declaration that he was concerned when he went with his father to the hospital—he does not say which one—and was not able to ask for more clarification about his father's condition. (Jebian Apr. 27, 2015 Declaration DE 78-23 ¶¶ 4–5). He does not describe when this visit took place although the Court has surmised that this might be the March or[14] November 2010 visit to Baptist Hospital described during Jebian's deposition. (Jebian Depo. DE 85-2 226:2–20).

---

[14] Jebian's vagueness precludes there being a genuine issue of material fact for two reasons. In addition to the lack of detail, the imprecision of the description means that it may concern the March 2010 visit and thus be time-barred. The Eleventh Circuit recently affirmed a district court's finding that a plaintiff lacked standing and repeated the instruction that courts "may not

Jebian testifies in his deposition that VRI was used in situations—again, it is not clear when and at which hospital—where "effective communication could not be obtained through a video camera, including when peripheral intravenous (IV) catheters were inserted in [his] wrists or forearms." (DE 61 ¶ 46).  However, Jebian cannot explain how the physical act of signing with an IV—which the Court assumes is difficult—is any more or less difficult with VRI than it would be with an in-person interpreter.  *Id.* (citing Jebian Depo. DE 61-15 33:22–35:24); (*see also* Jebian Apr. Decl. DE 78-23 ¶ 8).  Likewise, Jebian testifies that "[t]here are many, many, many reasons why [VRI] is not successful.  For example, maybe if I have to take off my glasses, I can't see them." (Jebian Depo. DE 59-2 321:21-322:5).  He also expresses frustration that the VRI could not accompany him into the MRI, yet there is no indication on the record that an in-person interpreter could communicate with a deaf patient during that diagnostic procedure.  (Jebian Depo. DE 78-6 38:1–7).  In each situation Jebian raises, whether communication is effectuated by an in-person interpreter or VRI, the act of communication is equally impeded by a factor external to the communicators.

Jebian can only identify a single instance where he could not understand the interpreter using VRI.  (DE 78 ¶ 11; Jebian Depo. DE 78-6 at 8–10) ("One time I used the VRI.  In Baptist. . . . I think it was March 2011.").  Jebian testifies that, on that one occasion, he could not see and understand the interpreter because there was static and he could not differentiate the interpreter's signing from her black blouse and the dark background.  (DE 78 ¶ 11; *see also* Jebian Apr. Decl. DE 78-23 ¶ 8).  He states that it

---

speculate concerning the existence of standing or piece together support for the plaintiff." *Duty Free Americas, Inc. v. Estee Lauder Cos., Inc.*, 797 F.3d 1248, 1271 (11th Cir. 2015) (quoting *Shotz v. Cates,* 256 F.3d 1077, 1081 (11th Cir. 2001)) (internal quotation omitted).

was hard for him to understand and he said, although it is not clear to whom and in what language, "I can't understand the interpreter." (Jebian Depo DE 78-6 27:8–9). However, this testimony is completely unsubstantiated because there is no record that Jebian went to either of Defendants' hospitals at any time in 2011. Jebian's only visit in March of any year within the limitations period is March 11, 2014,[15] which is discussed below.

On July 11, 2012, Jebian went to Baptist Hospital for treatment of pain in his chest. (Jebian Depo. DE 59-2 321:21-322:5). He refused Defendants' offer of VRI because of his previous bad experience with VRI on an unspecified date. *Id.* at 328:9–329:15; 333:11–334:3. Instead of using VRI, Jebian called his own in-person interpreter. *Id.* at. 329:18-22. Until the in-person interpreter arrived, he communicated with medical personnel by writing notes. *Id.* at 330:4–8. Although expressing frustration, he cannot point to a time during his July 11, 2012 visit when Defendants' medical staff members were unable to ascertain his chief medical complaint, when they were unable to create a treatment plan, or when Jebian could not understand his instructions under the treatment plan. (Jebian Apr. Decl. DE 78-23 ¶ 7). While there is a notation that Jebian's deafness may have "limited" the evaluation, history, or exam, the clinical report generated during his visit to Baptist Hospital belies any claim that communication was so limited as to be ineffective. (July 11, 2012 Baptist Hospital Clinical Report DE 59-3 at 11–22). Defendants' staff noted Jebian's chief complaint ("chest pain"), onset of symptoms ("started last night"), severity of condition ("[a]t its

---

[15] When discussing his dislike of VRI in his deposition and declarations, Jebian cannot be referring to the March 2014 visit because he commented to Defendants' staff in July 2012 that he had had a bad experience with VRI in the past. (Jebian Depo. DE 59-2 328:9–329:15). Thus, the bad experience that has led him to reject VRI whenever offered appears to have taken place in 2010 or earlier, and likely before the limitations period.

maximum, severity described as moderate"), and information available in the outpatient context only through patient reporting ("[t]he patient has had insomnia.  No loss of appetite, weight loss, visual disturbance, or muscle aches.  No decreased urine output."). *Id.* at 11.  After x-rays were taken, lab work was completed, and the results were reviewed, Jebian's condition was judged to be "improved and stable" and he was sent home with medication, instructions, and a follow up plan for future treatment.  *Id.* at 18.  The notes specifically mention that Jebian "communicated via interpreter that he feels great." *Id.*  Jebian "verbalized understanding (via interpreter)" and was discharged.  *Id.*; (July 11, 2012 instructions page bearing Jebian's signature DE 59-3 at 22; Jebian Depo. DE 59-2 331:9-332:6).

A few days later, on July 15, 2012, Jebian again went to Baptist Hospital, this time with pain in his lower back and kidneys.  (Jebian Depo. DE 59-2 341:9–21).  Again, Jebian refused use of the VRI when it was offered to him.  *Id.* at 342:15–20. Apparently, both Jebian and his father[16] thought that the VRI would not work because the hospital staff were unsure of how to operate it.  *Id.* at 343:1–8.   On that occasion, Jebian's father helped to interpret.  *Id.* at 344:13–20.  As with his previous July visit, there is no record indicating that hospital staff were unable to obtain the necessary information and provide appropriate treatment.  And, despite his speculation that the VRI would not assist communication, Jebian did not testify that he was unable to communicate effectively.  *Id.* at 344:10–24.[17]

---

[16] Jebian did not cite, in either the documents supporting his motion for partial summary judgment or his responsive documents opposing Defendants' motion for summary judgment, an affidavit, declaration, deposition transcript, or any sworn testimony from his father to corroborate his allegation.  (*See* DE 61; 78).

[17] Jebian Depo. DE 59-2 344:13–24:

On March 11, 2014, Jebian returned to Baptist Hospital with injuries sustained while playing football. *Id.* at 346:8–14. Although Jebian initially refused VRI (*id.* at 353:18– 21), he ultimately communicated with the medical staff using VRI during that visit (*id.* at 358:1–5). Despite Jebian's testimony that the VRI was at times not clear or "would black out," and was not effective, he did not state, nor was there any indication in the hospital records, that he was unable to communicate effectively with Defendants' staff. *Id.* at 358:6–10.

Rather, on this occasion—as in July 2012—the records demonstrate effective communication with Jebian. Baptist Hospital's staff noted Jebian's chief complaint ("chest pain, broken rib"; "chest discomfort"), onset of symptoms ("started 3 days ago and is still present"), severity of condition ("[a]t its maximum, severity described as mild"), and information available in the outpatient context only through patient reporting (no "difficulty with urination."). (Mar. 11, 2014 Baptist Hospital Clinical Report DE 59-3 at 72). After the Baptist Hospital staff took x-rays, performed an EKG, completed lab work, and reviewed the results, Jebian was judged to be in "good and stable" condition and he was sent home with medication, instructions, and a follow up plan for future treatment. *Id.* at 75, 81. The staff specifically noted that "[p]atient and family counseled in person several times regarding the patient's stable condition, test results, diagnosis, and need for follow-up. Concerns were addressed." *Id.* at 75. Jebian "verbalized

---

| Attorney: | And during the July 15 visit, your father translated or interpreted for you to communicate with the staff during that visit. |
|---|---|
| Jebian: | He was helping me, yes . . . he was helping me communicate. |
| Attorney: | And you were treated and released and discharged from the hospital on that date. Correct? |
| Jebian: | Yes. |

understanding" of the discharge instructions and was discharged. *Id.*; (Mar. 11, 2014 instructions page bearing Jebian's signature DE 59-3 at 81).

## III.   DISCUSSION

### a. Eleventh Circuit Precedent

Four recent Eleventh Circuit opinions govern[18] the disposition of this case.  The first of these, *Liese v. Indian River Hosp. Dist.*, thoroughly analyzed the issue of when compensatory damages are available to a deaf plaintiff suing for violations of the RA and established deliberate indifference as the proper standard in the Eleventh Circuit. *Liese*, 701 F.3d at 334.  In that case, the plaintiffs repeatedly asked, orally and in writing, for interpreters, but were not given access to live interpretation services, either in-person or via VRI. *Id.* at 338–39.  Instead of receiving appropriate auxiliary aids, the plaintiffs in *Liese* were "laughed at." *Id.* at 351.

Mrs. Liese, the deaf patient plaintiff, stated in no uncertain terms that she could not lip read and that she did not understand the majority of her interactions with a specific doctor, Dr. Perry, who ignored her when she could not read his lips or understand his pantomime. *Id.* at 339–40.  Significantly, Mrs. Liese did not understand why tests performed on her were necessary; she did not understand the results from those tests; she did not understand the reason for her gall bladder surgery when she had presented with chest pains; and she could not understand the doctor's post-operative instructions. *Id.* at 339–41.

---

[18] *Gomez v. Dade Cty. Fed. Credit Union*, discussed *infra*, is unpublished.  The Court is cognizant of U.S. CT. OF APP. 11TH CIR. R. 36-2 providing that unpublished opinions are not considered binding precedent, but may be cited as persuasive authority.

The *Liese* case is remarkable because of its extraordinary facts.  An emergency room doctor laughed at a deaf patient who understood little to nothing of a surgical procedure requiring general anesthetic while his  staff refused to bring an available VRI system out of the storage closet to assist.  The Eleventh Circuit reversed the district court's summary judgment in favor of the hospital and held that plaintiffs were entitled to present the jury with the issue of whether the defendants, acting through their "medical personnel with the necessary decision-making authority," were deliberately indifferent to plaintiffs' federal rights. *Id.* at 356.

The circumstances in *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, stand "in stark contrast" to the facts in *Liese. McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1149 (11th Cir. 2014).  There "the staff at both hospitals took steps to ensure that they were able to effectively communicate" with the minor plaintiff by using "written notes and visual aids," and "rel[ying] on [plaintiff's] parents and deaf sister" to interpret using sign language. *Id.* at 1138.  Despite a positive outcome from treatment for ulcerative colitis, including surgery to remove the colon, the minor plaintiff and his family sued the hospitals because they failed to provide "a professionally trained sign language interpreter." *Id.* at 1138, 1140.

The minor plaintiff, D.F., did not know that the first hospital could provide a sign language interpreter and so neither he nor his parents asked for one. *Id.* at 1139.  Nevertheless, his attending physician at the first hospital "believed that he was effectively communicating" with D.F. and the medical records did not cast doubt on that belief. *Id.*  At the second hospital, doctors successfully performed surgery on D.F.'s colon. *Id.* at 1141.  Although D.F. later testified that he only understood a portion of the

preoperative explanation, he gave no indication of this at the time. *Id.* at 1141 n.3.
After being discharged from the second hospital, D.F. was "doing well in his recovery"
and "able to control his symptoms." *Id.* at 1140. In outpatient visits to monitor D.F.'s
progress, the hospital provided an interpreter. *Id.*

The district court in *McCullum* granted summary judgment in favor of the
defendant hospitals because there was no evidence suggesting that the methods used
"were ineffective as auxiliary aids" and that the accommodations received by D.F. "were
insufficient." *Id.* at 1148–49. The district court also granted summary judgment in favor
of the defendant hospitals on the claims for injunctive relief because D.F. lacked
standing. *Id.* at 1145. The *McCullum* panel agreed with the district court's conclusion
that D.F. lacked standing because he produced "no medical evidence in support" of his
contention that his "chronic medical condition from which he continues to experience
complications" created a real and immediate threat that he would be hospitalized
again.[19] *Id.* at 1145–46, 1149.

In *Martin v. Halifax Healthcare Sys., Inc.*, the most recent decision regarding the
viability of similar ADA and RA claims, the Eleventh Circuit was asked to determine
whether the district court erred in granting summary judgment and finding that there was
no genuine issue of material fact as to whether deaf plaintiffs were denied the benefits
of the hospital. *Martin v. Halifax Healthcare Sys., Inc.*, Case No. 14-12771, --- F. App'x
----, 2015 WL 4591796, at *1 (11th Cir. July 31, 2015). In that case, three deaf patient

---

[19] Plaintiffs in *McCullum* also sought declaratory relief, but this was not discussed in either the
district court's order on motion to dismiss, *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*,
Case No. 6:11-CV-1387-ORL-31, 2012 WL 207025, at *1 (M.D. Fla. Jan. 24, 2012), its
summary judgment order, *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, Case No. 6:11–cv–
1387–Orl–31GJK, 2013 WL 1212860 (M.D. Fla. Mar. 25, 2013), or the Eleventh Circuit's opinion
affirming the district court orders, *McCullum*, 768 F.3d at 1135.

plaintiffs sued the defendant hospitals for failing to provide "continuous live interpreting services" during their hospital stays. *Id.*

The first *Martin* plaintiff, John D'Ambrosio, sought emergency treatment to save his life during a major heart attack. *Martin*, 2015 WL 4591796, at *1. The emergent nature of his condition, where time was of the essence,[20] changed the analysis for Mr. D'Ambrosio's pre-operative communications, but was not relevant to the subsequent use of auxiliary aids to communicate. During his hospitalization following the emergency procedure, the hospital staff used "a variety of appropriate auxiliary aids to ensure effective communication with him, including simple but detailed written notes and graphics." *Id.* at *7. In declarations proffered in support of plaintiffs' opposition to summary judgment, Mr. D'Ambrosio and his girlfriend summarily stated that "(1) they requested an interpreter during their interactions with the hospital and on many occasions [an interpreter] was not provided and (2) they did not understand the information the hospital staff tried to convey through other means, such as written notes." *Id.* at *5. They "never specified what information they did not understand." *Id.* at *5, *7. Based on this lack of evidence of ineffective communication, the Eleventh Circuit applied *Liese* and *McCullum* and concluded that the district court correctly granted summary judgment in favor of the defendant hospitals as to Mr. D'Ambrosio. *Id.* at *8.

The second *Martin* plaintiff, Yolanda Gervarzes, swore in a declaration that "she requested live ASL interpreting services, that the services were not provided, and that,

---

[20] *Martin*, 2015 WL 4591796, at *7 ("Indeed, had the doctors not gotten D'Ambrosio into the catheterization lab as quickly as possible, but instead waited for an interpreter to arrive, they might well have been unable to save his life. In short, the biggest barrier to the staff's ability to converse with D'Ambrosio at that time was not the absence of a live ASL interpreter, but the fact that the doctors had to immediately begin the procedure necessary to save his life.").

as a result, she was unable to participate in her daughter's care." *Id.* Like Mr. D'Ambrosio, Ms. Gervarzes did not specify how her comprehension and, thus, her participation in her daughter's treatment was limited by the lack of an in-person interpreter. *Id.* The Eleventh Circuit agreed with the district court that "a reasonable jury could not conclude that the hospital failed to provide the auxiliary aids necessary for effective communication with Gervarzes," when she was offered, but rejected VRI upon arrival, received some in-person live interpreting services, and was able to communicate via her family member and by writing notes. *Id.*

The third *Martin* plaintiff, Richard Martin, never asked for an in-person interpreter. *Id.* However, the Eleventh Circuit has made clear that the patient plaintiff's personal preference is not the only—or even the dispositive—inquiry. Plaintiffs' requests for in-person interpreters do not make in-person interpretation a necessity under the ADA and RA. *Liese*, 701 F.3d at 343; *McCullum*, 768 F.3d at 1147. More important for a Court's consideration is whether the lack of auxiliary aids resulted in demonstrably ineffective communication. In Mr. Martin's case, he received typed instructions that he indicated he understood following treatment for "a bump on the head." *Martin*, 2015 WL 4591796, at *8. Accordingly, the Eleventh Circuit affirmed the district court's judgment that the defendant hospitals did not violate the ADA or the RA by failing to provide a live interpreter. *Id.*

Finally, in a case not involving hospitals or sign language interpreters, *Gomez v. Dade Cty. Fed. Credit Union*, the Eleventh Circuit considered auxiliary aids in the context of automatic teller machines ("ATMs") that failed on occasion to "giv[e] audible instructions as required by the Americans with Disabilities Act." *Gomez*, 610 F. App'x at

860.  In *Gomez*, the court concluded that "the law does not permit injunctive relief against businesses whose noncompliance was unintentional, temporary, and isolated." *Id*.  This is because "the law recognizes that access measures may fail from time to time." *Id.* at 861 ("When snow falls on a wheelchair ramp, the ramp may be briefly impassable.").  More complex access measures, like VRI, are no different.  "Periodic hurdles may thus arise not as a result of negligence or bad intent, but as a natural attendant of the access-enhancing solution." *Id.* at 864.  Therefore, when glitches occur and repairs are needed, "the regulations do not prohibit isolated or temporary interruptions in service or access." *Id.* at 861.  This temporary malfunction exception is, however, "a narrow one." *Id.*

Mr. Gomez attempted a transaction at an ATM operated by the defendant, but the voice guidance system did not work. *Id.*  He sued under the ADA alleging generally—he did not provide "specific information about the alleged malfunction"—that the ATM in question did not comply with ADA standards. *Id.*  In response to Mr. Gomez's lawsuit, the defendant ATM operator presented evidence that the ATM in question had been tested for ADA compliance both before and after Mr. Gomez's attempted transaction. *Id.*  Both of those tests showed the ADA-required voice guidance system to be operational. *Id.*  Undeterred, Mr. Gomez investigated additional ATMs and found one that worked for a time, but "stopped during the course of the transaction." *Id.* at 862.  The district court refused, however, "to credit plaintiff's assertion that other ATMs were out of compliance, because [plaintiff] offered nothing to corroborate the findings of his unnamed investigator." *Id.*

The district court dismissed the case for lack of standing. *Id.* Affirming the district court's decision, the Eleventh Circuit found that Mr. Gomez could not "establish the crucial fact underpinning both tests: Dade's failure to comply with ADA rules." *Id.* at 864. The view that an isolated malfunction did not create ADA liability was bolstered by the ATM operator defendant's statements that the ATMs were retrofitted before the alleged malfunction and that it had a policy in place to keep ATMs in working order. *Id.* Mr. Gomez's lack of actual evidence, as distinguished from bare allegations of malfunctioning ATMs, persuaded the *Gomez* court that he had not raised a genuine dispute of fact regarding defendant's ADA compliance. *Id.* Consequently, the Eleventh Circuit held that dismissal of Mr. Gomez's case was appropriate because "Plaintiff's threadbare allegations do not clear the bar" to "satisfy the minima of constitutional standing to maintain a claim." *Id.* at 865.

**b. Elements and Remedies Under the ADA and RA**

ADA and RA claims are governed by the same legal standard. *Martin*, 2015 WL 4591796, at *6 (citing *Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000)). Both deaf patients and deaf companions—e.g., family members—of patients are protected under the ADA and RA. *See* 28 C.F.R. § 36.303(c)(1)(i). Under either Act, plaintiffs must prove: "(1) that they are qualified individuals with a disability, (2) who were excluded from participation in or denied the benefits of the hospital's services, programs, or activities, or otherwise discriminated against, (3) on account of their disability." *Id.* (citing *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001)).

Plaintiffs seek injunctive relief. To establish standing for such relief, a plaintiff must first demonstrate, among other things, that he or she will suffer an injury in fact

which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Regarding an "injury in fact," the Supreme Court has explained that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). "[B]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate-as opposed to a merely conjectural or hypothetical-threat of *future* injury." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (emphasis in original). In *McCullum*, the Eleventh Circuit held that the plaintiff lacked standing to seek injunctive relief when he presented no evidence to support the conclusion that his allegedly "chronic medical condition" created a real and immediate threat that he would return to the defendants' hospitals. 768 F.3d at 1145–46 (internal quotations omitted).

Plaintiffs also seek compensatory damages. To recover compensatory damages, a plaintiff must prove an additional element: "that the exclusion or denial was the result of intentional discrimination." *Martin*, 2015 WL 4591796, at *6 (citing *Liese*, 701 F.3d at 344). The court in *Liese* established that a plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference. 701 F.3d at 345. Deliberate indifference occurs when a defendant knows that a rights violation is substantially likely and fails to act on that likelihood. *Liese*, 701 F.3d at 344. However, a court need not reach the question of deliberate indifference if "a plaintiff cannot show

that a defendant failed to provide appropriate communication aids." *Martin*, 2015 WL 4591796, at *9.

Under the applicable regulations, a public accommodation is required to provide disabled individuals with an "equal" opportunity "to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation." 28 C.F.R. § 36.202.  The regulations provide that hospitals must consider patient preference, but they are not bound by it:

> A public accommodation **should consult** with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication, **but the ultimate decision as to what measures to take rests with the public accommodation**, provided that the method chosen results in effective communication.

28 C.F.R. § 36.303(c)(1)(ii) (emphasis added).  As interpreted by the Eleventh Circuit, "an exclusion or denial occurs when a hospital fails to provide 'appropriate auxiliary aids' to a deaf individual, including a deaf companion, 'where necessary to ensure effective communication.'" *Martin*, 2015 WL 4591796, at *6 (construing and quoting 28 C.F.R. § 36.303(c)(1)).

Therefore, "not every denial of a request for an auxiliary aid precludes summary judgment or creates liability." *Martin*, 2015 WL 4591796, at *7 (citing *Liese*, 701 F.3d at 343).  If the courts treated such claims otherwise, the *Martin* court warned, "a requested service would automatically be transformed into a 'necessary' service merely by the fact that it was requested." *Id.*; *see also Liese*, 701 F.3d at 343 (refusing to construe the regulations in a manner that "would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid"); *McCullum*, 768 F.3d at 1147 (the applicable regulations "do

not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded").[21]

The effective communication standard is meant to be practical and does not require perfection. *Bircoll v. Miami-Dade Cty.*, 480 F.3d 1072, 1086 (11th Cir. 2007) (affirming grant of summary judgment when deaf plaintiff understood fifty percent of what was said by reading lips); *Gevarzes v. City of Port Orange, Fla.*, Case No. 6:12-CV-1126-ORL-37, 2013 WL 6231269, at *2 (M.D. Fla. Dec. 2, 2013) ("Effective communication does not require perfect communication."); 45 C.F.R. § 84.4 ("[A]ids, benefits, and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons."). To determine whether a hospital has provided appropriate auxiliary aids to effective communication, courts undertake a "'fact-intensive' inquiry that depends on context." *Martin*, 2015 WL 4591796, at *7 (quoting *Liese*, 701 F.3d at 342). Because the type of

---

[21] Plaintiffs direct the Court to a recent Fifth Circuit opinion that is neither controlling nor remotely applicable to the facts of this case. *Perez v. Doctors Hosp. at Renaissance, Ltd.*, Case No. 14-41349, --- F. App'x ----, 2015 WL 5085775, at *5, *2–3 (5th Cir. Aug. 28, 2015). In *Perez*, the deaf parents of a child who had been diagnosed with a brain tumor at four months of age appealed the district court's one-page order finding that they lacked standing to obtain injunctive relief even though their daughter was undergoing her second round of chemotherapy during the pendency of the case and appeal. *Id.*, 2015 WL 5085775, at *1. The court of appeals found a genuine issue of material fact regarding standing precluded summary judgment when no in-person interpreter was provided to the parents of the child with cancer—who had scheduled an 80-week course of chemotherapy at the hospital—and the defendant hospital admitted its ADA compliance policy needed revision, but failed to revise it. *Id.*, 2015 WL 5085775, at *3. Apart from its markedly different facts, *Perez* is also distinguishable because the Fifth Circuit considered the deaf parents' demands for an in-person interpreter to be sufficient in context to create a genuine issue of material fact regarding the necessity of an interpreter for effective communication. *Id.* The Eleventh Circuit does not apply the same analysis. *See Martin*, 2015 WL 4591796, at *7; *Liese*, 701 F.3d at 343; *McCullum*, 768 F.3d at 1147. In *Liese*, the court noted that its intentional discrimination analysis comported with every circuit to have consider the question except the Fifth. *Liese*, 701 F.3d at 345. The *Perez* Court cited *Liese*, but declined to adopt the Eleventh Circuit standard. *Perez*, 2015 WL 5085775, at *4 (citing *Liese*, 701 F.3d at 345) ("We did not define what we meant by intent in *Delano–Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002), . . . and we decline to make new law on the nature of intent at this time.").

aid that is necessary varies, the regulation includes a non-exhaustive list of examples of "auxiliary aids and services" rather than mandating the use of one auxiliary aid or another. 28 C.F.R. §§ 36.303(b–c). "Appropriate auxiliary aids" include live interpreters or video remote interpreting systems, among other aids such as computer-aided transcription services, written materials, and exchange of written notes. *See Martin*, 2015 WL 4591796, at *6 (citing 28 C.F.R. § 36.303(b)). When VRI is used as an auxiliary aid, it must be connected to a network that "delivers high-quality video images that do not produce lags, choppy, blurry, or grainy images, or irregular pauses in communication." 28 C.F.R. § 36.303(f). An isolated or temporary interruption in service does not, however, create ADA or RA liability. *Gomez*, 610 F. App'x at 861.

### c. Exclusion or Denial of Benefits

#### i. Cheylla Silva

Here, as in *Martin*, there is no dispute that Silva is a qualified individual with a disability. *Martin*, 2015 WL 4591796, at *6. And like *Martin* and *McCullum*, the record here indicates that Baptist Hospital and South Miami Hospital provided the appropriate auxiliary aids necessary to ensure that Silva could effectively communicate with hospital staff. *See id.*; *McCullum*, 768 F.3d at 1138. The undisputed evidence shows that during Silva's various visits to Defendants' hospitals, their staff used a variety of auxiliary aids to ensure effective communication with her, including written notes, VRI, and in-person interpreters. Despite her generalized assertion that she did not understand the staff, Silva cannot identify what exactly she failed to understand during any of her visits to Defendants' hospitals.

Even for visits where Silva has alleged that there was some difficulty with the VRI, she has not offered any facts showing that Defendants failed to ensure effective communication through appropriate auxiliary aids.  On January 4, 2011, Baptist Hospital provided Silva with an in-person interpreter when the VRI did not work for a time on that day.  On May 20, 2011, Baptist Hospital's clinical records demonstrate that VRI ensured communication effective for treating her moderate abdominal pain, for addressing Silva's concerns, and for explaining discharge instructions.  On July 8 and 18, 2014, Silva was provided with an in-person interpreter at South Miami Hospital.  On March 9, 2015, an in-person interpreter was called when the VRI worked inconsistently for an hour and the VRI was used to communicate until the interpreter arrived at Baptist Hospital.  The hospital's clinical records demonstrate that, on that date, the auxiliary aids used, including VRI and an in-person interpreter, ensured communication effective for treating her mild chest pain, for reviewing medication, and for explaining discharge instructions.

In light of the above evidence, Silva's declarations and deposition testimony are insufficient to show that Defendants failed to provide aids necessary to ensure effective communication in violation of the ADA or the RA.  The Eleventh Circuit "has consistently held that conclusory allegations without specific supporting facts have no probative value."  *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (citing *Evers v. General Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985)).  Silva cannot point to any time when Defendants' medical staff was unable to ascertain her chief medical complaint, unable to create a treatment plan, or unable to help Silva understand her instructions under the treatment plan.  In the absence of a genuine issue of material fact

30

that the auxiliary aids necessary to ensure effective communication were provided,

Silva's request for different aids is immaterial.  *See Martin*, 2015 WL 4591796, at *8 ("As

we explained in *Liese*, a hospital is not required by the ADA or the Rehab Act to provide

every auxiliary aid that is demanded."); *Liese*, 701 F.3d at 343; *McCullum*, 768 F.3d at

1147.

As in *Gomez* and *Martin*, Silva has not created a genuine issue on "the crucial

fact underpinning" the liability analysis under the ADA: "failure to comply with ADA

rules."  *Gomez*, 610 F. App'x at 864 (analyzing appeal of dismissal under summary

judgment standard); *Martin*, 2015 WL 4591796, at *7–8 ("[A] reasonable jury could not

conclude that the hospital failed to provide the auxiliary aids necessary for effective

communication.").  And like Ms. Gervarzes and Mr. D'Ambrosio in *Martin*, because Silva

"never specified what information [she] did not understand," no rational jury could find a

failure to comply with the ADA and RA and the Court need not reach the question of

deliberate indifference.  *Id.* at *5, *9; *see also Gomez*, 610 F. App'x at 864.  Accordingly,

Defendants are entitled to summary judgment on Silva's claims.

    ii.   **John Paul Jebian**

Jebian's deposition testimony and declarations fail to create a genuine issue of

material fact for the same reasons discussed with regard to Silva's claims.  Jebian has

testified that he prefers an in-person interpreter because he "want[s] to know

everything."  (Jebian Apr. Decl. DE 78-23 ¶ 7).  But knowing "everything" is not the

standard set forth by the regulations to assess whether a defendant's performance

comports with the law.  *Bircoll*, 480 F.3d at 1086; *Gevarzes*, 2013 WL 6231269, at *2;

*McCullum*, 768 F.3d at 1147 (the applicable regulations "do not require healthcare

providers to supply any and all auxiliary aids even if they are desired and demanded").

Jebian further explains that he "feel[s] that it is important for [him] to receive an

interpreter when [he goes] to the hospital," because "a hearing person can read the

information and understand it," and "a hearing person can read a document . . . and [he]

will not be able to." (Jebian Apr. Decl. DE 78-23 ¶ 3).[22]  Jebian admits, however, that

he "communicates with his attorney through email and faxes."  (DE 59 ¶ 62; DE 78 ¶

("Admitted, but does not contain material facts.")).

Jebian argues that he "is very anxious and nervous" when he goes to the

hospital, "as it is usually a very urgent situation."  (Jebian Apr. Decl. DE 78-23 ¶ 10).

But the regulations do not prohibit the use of VRI in hospitals or even specifically

proscribe its use in emergency departments.  28 C.F.R. § 36.303.  The regulations do,

however, prohibit using auxiliary aids where they will not result in effective

communication.  There is no evidence in this record that the auxiliary aids chosen by

Defendants failed to ensure effective communication with Jebian during any of his visits

to their hospitals.

Jebian's experience is distinguished from Silva's by the fact that he was more

consistent in rejecting VRI even before it was given an opportunity to work.  See Martin,

2015 WL 4591796, at *8 ("Gervarzes did not specify how her participation was limited.

Moreover, there is undisputed evidence that Gervarzes was offered interpreting

services over the LifeLinks system upon her arrival to the hospital, but she rejected

those services.").  However, Jebian's claims are identical to Silva's in that he too cannot

---

[22] Jebian has experience with literacy in the deaf community.  According to his profile on the
Miami-Dade County Department of Cultural Affairs Website, "[h]e has tutored deaf children
through the Deaf Family Literacy Academy, funded through Barbara Bush Family Literacy
foundation."  See MIAMI-DADE COUNTY DEPARTMENT OF CULTURAL AFFAIRS,
http://www.miamidadearts.org/john-paul-jebian (last visited Sept. 10, 2015).

identify what exactly he failed to understand, either as a patient or as his father's companion, during any of his visits to Defendants' hospitals.  The undisputed evidence shows that during Jebian's various visits to Defendants' hospitals, their staff used a variety of auxiliary aids to ensure effective communication with him, including written notes, VRI, and in-person interpreters.

On July 11, 2012, Jebian went to Baptist Hospital, refused VRI, called and relied upon an in-person interpreter, communicated with written notes until the interpreter arrived, and was evaluated, treated, and discharged.  The hospital's clinical records demonstrate that the auxiliary aids (offered and used), including written notes, VRI, and an in-person interpreter, ensured communication effective for treatment of his moderate chest pain, for prescription of medication, and for explanation of discharge instructions.  On July 15, 2012, Jebian again refused VRI at Baptist Hospital, but was nevertheless able to communicate with the help of his father and was treated and discharged.  On March 11, 2014, Jebian initially refused VRI, but then used it despite reported difficulties.  The hospital's clinical records demonstrate that the auxiliary aids used, including VRI, ensured communication effective for treating his mild chest pain, for reviewing medication, test results, and the need for follow-up, and for explaining discharge instructions.

In light of the above evidence, a reasonable jury could not conclude that Defendants failed to provide auxiliary aids necessary to ensure effective communication with Jebian.  This is especially true where Jebian consistently rejected aids offered and available to him.  Jebian cannot point to any time when Defendants' medical staff was unable to ascertain his chief medical complaint, unable to create a treatment plan, or

unable to help Jebian understand his instructions under the treatment plan.  And there is no evidence that he was unable to participate in his father's treatment because he was denied appropriate auxiliary aids as a companion.  In the absence of a genuine issue of material fact that the auxiliary aids necessary to ensure effective communication were provided, Jebian's request for different aids is immaterial.  *See Martin*, 2015 WL 4591796, at *8; *Liese*, 701 F.3d at 343; *McCullum*, 768 F.3d at 1147.

Like Silva, Jebian has not presented a genuine issue that Defendants failed to comply with the ADA and RA.  And like Silva, the Court need not reach the question of deliberate indifference as to Jebian.  Accordingly, Defendants are entitled to summary judgment on Jebian's claims.

### d. Plaintiffs Lack Standing To Seek Injunctive Relief

Even if Plaintiffs had created a genuine issue of material fact as to whether Defendants violated the ADA or the RA by failing to provide appropriate auxiliary aids, which they have not, Plaintiffs lack standing to bring their claims for injunctive relief for two reasons: it is merely speculative that Plaintiffs will return to Defendants' hospitals and there is no reliable indication that the VRI technology will malfunction in the future.

First, Plaintiffs repeatedly state that their preference is to return to Defendants' hospitals, but there is no real and immediate threat that either of the Plaintiffs or Jebian's father will be hospitalized again at Defendants' facilities.  A plaintiff's "speculation, unsupported by evidence, cannot defeat summary judgment." *Brown v. Publix Super Markets, Inc.*, Case No. 15-10504, --- F. App'x ----, 2015 WL 5194914, at *4 (11th Cir. Sept. 8, 2015) (quoting *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates

a false issue, the demolition of which is a primary goal of summary judgment.")
(emphasis in original)).  Silva promises that she will return to Defendants' hospitals in
the near future, "[d]ue to many factors, including the location of [her] doctors, the fact
that Defendants have all of [her] medical records and history, the proximity to [her]
home, and history of prior care/treatment." (Silva Decl. DE 61-13 ¶ 22).[23]

These representations are similar to those presented in *McCullum*.  There the
district court found that the patient plaintiff lacked standing even though he had alleged
a chronic condition that would bring him back to the defendants' facilities.  *Id.*, 768 F.3d
at 1145.  This was, the Eleventh Circuit held, insufficient to create a real and immediate
threat that he would be hospitalized again.  *Id.*, 768 F.3d at 1141, 1145–46, 1149.  Of
particular note, the district court predicated its conclusion on the fact that the plaintiff
produced "no medical evidence in support" of the "chronic medical condition" that
created a real and immediate threat of hospitalization.  *Id.* at 1145–46, 1149.

In this case, neither Plaintiff suffers from a chronic condition and the Court has
been provided with no medical evidence that suggests such a diagnosis for either
Plaintiff or Jebian's father.  Silva avers that she has continuing health issues including
high blood pressure, anemia, asthma, gastrointestinal problems, a heart condition
(murmur) and irregular blood pressure.[24]  (DE 78-9 ¶ 36).  However, manageable, non-
chronic conditions, such as those whose symptoms can be treated with over-the-
counter medication, do not support standing.  *McCullum*, 768 F.3d at 1141.  Jebian's
testimony concerning future visits to Defendants' hospitals is even more speculative

---

[23] Another hospital, non-party Kendall Regional Medical Center, is actually closer to her home.
(DE 59 ¶ 116; Silva Depo. DE 59-1 251: 4–7).

[24] Silva is no longer pregnant, having delivered a healthy baby at non-party Kendall Regional
Medical Center.

than Silva's. Essentially, Jebian asserts that Defendants' hospitals are relatively close to his home and that those hospitals maintain some of his medical records on file. (Jebian Mar. Decl. DE 61-14 ¶ 16; Jebian Depo. DE 85-2 209:20–212:5). He also adds that, due to his father's "ongoing health concerns and required follow-up," he will also likely visit Defendants' hospitals as a companion "in the near future." (Jebian Mar. Decl. DE 61-14 ¶ 17). This is insufficient. *See McCullum*, 768 F.3d at 1145–46, 1149; *Gomez*, 610 F. App'x at 865.

Second, Plaintiffs lack standing because, even assuming that Plaintiffs will return to Defendants' hospitals as patients or that Jebian will accompany his father as a companion, there is no reliable evidence indicating that they will experience a denial of benefits or discrimination. *See McCullum*, 768 F.3d at 1145–46. Silva recounts a March 9, 2015 visit where the VRI did not work correctly at the outset. But the staff was able to repair the VRI after a time and it was used to interpret until an in-person interpreter arrived. Silva's medical records for that day confirm that, although the VRI did not work for one hour and four minutes at the beginning of the visit, it was used effectively for the one hour and six minute period until the in-person interpreter arrived. And in an instance cited by Defendants' engineer, a bad battery frustrated the VRI communication between Silva and the medical staff at South Miami Hospital. This situation was easily remedied and is not likely to occur in the future with regular maintenance.

Jebian relates a March 2011 visit where there was static on the VRI and he could not clearly ascertain the interpreter's signing. As discussed above, this 2011 visit has no support in the record. The Court discusses it again only to note the fact that the

interpreter was wearing a dark blouse against a dark background, which may have played a greater part in Jebian's communication difficulties than did the static.

In any event, neither Plaintiff provided any ongoing technical reason why their isolated issues are likely to be repeated in the future.  As noted above, Plaintiffs presented no expert who had tested Defendants' hospitals.  Here, as in *Gomez*, Defendants produced statements that the accommodation was set up to function properly and that their engineers monitored, maintained, and upgraded the network to keep it reliable and stable.  Although the *Gomez* court applied a narrow exception, the Court finds that the existence—aside from conclusory allegations—of Silva's two concrete examples of VRI malfunctions in four years indicates that the technical issues presented on the record fit into the category of isolated or temporary interruption that is exempt from liability.  *Gomez*, 2015 WL 2082213, at *5 (citing 28 C.F.R. § 36.211(b)).  In such a circumstance where Plaintiffs have not raised a genuine dispute of fact regarding Defendants' ADA compliance, they lack standing.  *See id.* ("Because he marshalled proof of just one ATM malfunction—but no evidence regarding other technical glitches—Gomez has not raised a genuine dispute of fact regarding defendant's ADA compliance.") (citing FED. R. CIV. P. 56(c)(1)(A)).

Finally, not only have Defendants been providing Plaintiffs with facially appropriate auxiliary aids, but there is also no indication that an interruption in VRI service will prevent effective communication in the future.  In fact, like the defendants in *McCullum*, Defendants here have demonstrated that they are willing and able to provide auxiliary aids—including in-person interpreters—if VRI malfunctions.  (*See* DE 33-1 (consent decree providing for in-person interpreters during the delivery of Silva's

youngest child)).  Furthermore, Silva conceded that "[w]hen the VRI doesn't work, they have provided a live interpreter, yes."  (Silva Depo. DE 59-1 217:25–218:1).

Accordingly, summary judgment in favor of Defendants and against Plaintiffs is granted on the alternative ground that Plaintiffs lack standing to seek injunctive relief.

## IV.   CONCLUSION

For the reasons set forth above, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendants' motion for summary judgment (DE 60) is **GRANTED**.

2. Plaintiffs' motion for partial summary judgment (DE 62) is **DENIED**.

3. Judgment is hereby entered in favor of Defendants.

4. All pending motions are **DENIED AS MOOT**.

5. All deadlines and hearings are **CANCELED**.

6. The Clerk is directed to **CLOSE** the case.

**DONE AND ORDERED** in Chambers at Miami, Florida this _____ day of October, 2015.

_____
KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE